**AL–SITE CORPORATION and Magnivision, Inc., Plaintiffs–Appellants,**

v.

**VSI INTERNATIONAL, INC. and Myron Orlinsky, Defendants–Cross Appellants.**

Nos. 97–1593, 98–1008.

United States Court of Appeals, Federal Circuit.

March 30, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied May 25, 1999.

Peter T. Cobrin, Cobrin, Gittes & Samuel, of New York City, argued for plaintiffs-appellants. With him on the brief was

Stephen E. Nagin, Nagin, Gallop & Figueredo, P.A., of Miami, Florida, of counsel was Oren J. Warshavsky.

Donald W. Rupert, Mayer, Brown & Platt, of Chicago, Illinois, argued for defendants-cross appellants. With him on the brief were Robert S. Rigg and Lisa A. Schneider, of counsel on the brief were Richard L. Horn and Heather A. Libbey, Wilson & McIlvaine, of Chicago, Illinois, of counsel was Myles G. Cypen, Cypen & Cypen, of Miami, Florida.

Before: MAYER, Chief Judge, RICH, and RADER, Circuit Judges.

RADER, Circuit Judge.

This case involves patent, trademark, and trade dress infringement. After the United States District Court for the Southern District of Florida interpreted the claims, a jury found that VSI International, Inc. (VSI) had infringed several patents claiming specific hangers for displaying non-prescription eyeglasses. The jury also found trademark and trade dress infringement, and unfair competition. In addition, the jury found VSI's chairman and CEO, Myron Orlinsky, personally liable for these violations. Although Al–Site Corporation, now Magnivision, Inc. (Magnivision)[1], prevailed on infringement, it appeals the district court's claim construction. On review, this court discerns errors in claim construction. Under a correct claim construction, the record contains substantial evidence that VSI infringed Magnivision's patents. Therefore, this court affirms the patent infringement finding. The record, however, does not contain substantial evidence to support the jury's findings of trademark and trade dress infringement, unfair competition, or personal liability for Myron Orlinsky. Therefore, this court reverses those judgments.

## I.

Magnivision and VSI both sell non-prescription eyeglasses. Magnivision is the assignee of U.S. Patent Nos. 4,976,532 (the '532 patent), 5,144,345 (the '345 patent), 5,260,726 (the '726 patent), and 5,521,911 (the '911 patent). These patents claim technology for displaying eyeglasses on racks. The claimed inventions allow consumers to try on eyeglasses and return them to the rack without removing them from their display hangers.

Magnivision sued VSI, as well as its chairman and CEO, Myron Orlinsky, in his individual capacity, for infringement of the Magnivision patents, for infringement of Magnivision's MAGNIVISION trademark and the trade dress of various products, and for unfair competition under Florida law. Six years after filing, the district court conducted a jury trial. After interpreting the claims, the district court instructed the jury to apply its construction of the claims to determine infringement.

The jury determined that one of VSI's products (the Version 1 hanger tag) literally infringed the '532 patent. The jury also determined that a second VSI product (the Version 2 hanger tag) did not literally infringe the '345, '726, and '911 patents, but did infringe those patents under the doctrine of equivalents. The jury further concluded that the Magnivision patents were not invalid under 35 U.S.C. § 103. Additionally, the jury found that VSI had infringed Magnivision's trademark and trade dress and had engaged in unfair competition. Finally, the jury imposed personal liability on Myron Orlinsky, making him jointly and severally liable for the damage award.

Following the jury verdict, Magnivision moved for judgment as a matter of law that the Version 2 hanger tag literally infringed the '345, '726, and '911 patents. VSI's post-trial motion sought to reverse all of the jury's determinations. The dis-

---

1. After this litigation began, American Greetings Corporation acquired Al–Site Corporation, the named plaintiff in this case, and merged it with Magni–Tech Corporation to form Magnivision, Inc. The parties and this court, therefore, refer to the plaintiff as Magnivision.

trict court denied both motions and both parties appeal. Specifically, Magnivision challenges the district court's claim construction of the '345, '726, and '911 patents, arguing that the claims, if properly construed, would have been literally infringed by VSI's Version 2 hanger tag. VSI, on the other hand, contends that the district court's claim construction was correct but challenges the jury's determinations for lack of substantial evidence to support a verdict.

## II.

■ This court reviews the district court's denials of the motions for judgment as a matter of law using the same standards applied by the district court. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). This court will only upset a jury verdict if the record lacks substantial evidence to support the verdict. *See Motorola, Inc. v. Interdigital Tech. Corp.,* 121

F.3d 1461, 1466, 43 USPQ2d 1481, 1484 (Fed.Cir.1997); *Markman,* 52 F.3d at 975.

### Literal Infringement of the '532 patent

The jury determined that the Version 1 hanger tag literally infringes claims 8, 9, 14, 15, and 17 of the '532 patent. Claim 8, the independent claim from which the other infringed claims depend, claims the combination of a pair of eyeglasses and a hanger means for removably mounting the eyeglasses on a cantilevered support. The claim itself gives some structural definition of the hanger means as "including a body having aperture means adapted" for suspending the hanger and eyeglasses on the cantilevered support. Additionally, the hanger means includes an extension projecting from the bottom edge portion of the hanger body. This extension encircles the nose bridge of the eyeglasses. The claim specifies that "fastening means in engagement with said extension" hold the extension in a closed loop. Figure 1 from the '532 patent illustrates these claimed features:

The district court determined that the "fastening means" was a means-plus-function element subject to the interpretation requirements of 35 U.S.C. § 112, ¶ 6 (1994). Consistent with that determination, the trial court instructed the jury that "the fastening means ... is either a rivet or a button and hole arrangement as shown in the '532 patent or the structural equivalents thereof." Neither party challenges this part of the district court's claim construction.

On appeal, VSI contends that its Version 1 hanger tag does not infringe because it does not include the "fastening means" required by claim 8. VSI's Version 1 hanger tag is a one-piece paper sticker having two large portions connected by a narrow extension. The entire back of the tag, including the extension, is coated with an adhesive. Backing paper covers the adhesive to prevent undesired adhesion. In use, a merchant removes the backing paper from the large portions of the tag. The extension (still covered with backing paper) then wraps around the nose bridge of the glasses. This wrapping glues the large portions together. In use, therefore, glue secures the two large portions of the tag to each other, leaving the narrow extension of the tag wrapped around the bridge of the eyeglasses.

The adhesive used by VSI is not identical to the fastening structure (namely, a rivet or button) described in the '532 patent. The jury, however, applying the rules of § 112, ¶ 6, determined that the VSI adhesive was equivalent to the structure disclosed in the specification. Accordingly, the jury returned a verdict of literal infringement of the '532 patent. VSI argues that substantial evidence does not support the jury's finding of literal infringement.

VSI first challenges the jury determination that adhesive is structurally equivalent to the mechanical fasteners disclosed in the specification of the '532 patent. Magnivision's technical expert, Mr. Anders, testified that, for one of ordinary skill in the art, it would be an insubstantial change "to substitute a rivet for a staple or for glue or for any other method that's standard in the [point of purchase] industry to maintain this loop as a closed loop." *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309, 46 USPQ2d 1752, 1756–57 (Fed.Cir. 1998) ("The proper test [for determining equivalence under § 112, ¶ 6] is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial.... The question of known interchangeability is ... an important factor in determining equiva-

lence [under § 112, ¶ 6]."). Mr. Anders further testified that the use of glue "in between the two layers of the body ... is an insubstantial change from the other structure ... which was one of a rivet. People in point of purchase displays use glue or rivets or staples to accomplish the same function." *But see Chiuminatta*, 145 F.3d at 1309 ("Almost by definition, two structures that perform the same function may be substituted for one another. The question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another."). Mr. Anders additionally testified that "equivalent fastening means could be a rivet, glue or staple or some such similar [structure]." This testimony constitutes sufficient evidence to sustain the jury's verdict that persons of ordinary skill in the art consider glue an equivalent structure to those disclosed in the specification for maintaining a closed loop.

As a fallback position, VSI argues that, even if the glue is an equivalent of the rivet or button, Magnivision presented no evidence that the glue was "in engagement" with the extension as claim 8 requires. On cross examination, Mr. Anders identified the middle section of the Version 1 hanger tag as the "extension" element. Mr. Anders also identified the glue as the "fastening means" element. Because VSI leaves the backing paper on its extension (presumably to prevent the tag from adhering to the eyeglasses), VSI argues that its extension does not engage the fastening means as required by the claims of the '532 patent.

VSI's argument is unpersuasive. The claims of the '532 patent only require that the fastening means be "in engagement with" the extension. As noted above, VSI coats the extension of its Version 1 hanger tag with glue—the fastening means identified by Mr. Anders. Furthermore, Mr. Anders' testimony explains that the extension and the glued portions are one integral piece. The jury could have inter-

preted his testimony to mean that the extension includes more than the narrow, middle portion of the Version 1 tag. Under this interpretation, the extension would also directly engage the glue fastening means. Alternatively, the jury could have determined that the extension is only the narrow portion of the Version 1 tag, but that the fastening means includes one of the two portions of the tag body in addition to the glue. Under any of these reasonable views of the accused product, the extension of the Version 1 hanger tag is in engagement with the glue fastening means as required by the claims.

■ As the finder of fact, the jury receives deference for its function of weighing witness demeanor, credibility, and meaning. *See Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (factfinder entitled to deference on credibility determinations). Substantial evidence therefore supports the jury's verdict that VSI's Version 1 hanger tag literally infringes the '532 patent.

### Infringement of the '345, '726, and '911 Patents

The jury determined that VSI's Version 2 hanger tag and display rack did not literally infringe claims 1 and 2 of the '345 patent; claims 1 and 2 of the '726 patent; or claims 1, 2, and 3 of the '911 patent. The jury nevertheless found infringement of each of these claims under the doctrine of equivalents. Magnivision argues that the district court misconstrued these claims, and that, under the proper claim construction, VSI's products literally infringe these claims as a matter of law. VSI, on the other hand, embraces the district court's claim construction and argues that prosecution history estoppel precludes a finding of infringement under the doctrine of equivalents.

Claim 1 of the '345 patent and claim 1 of the '726 patent are similar. Both claim "[t]he combination of an eyeglass display member and an eyeglass hanger member."

In each of these claims, this combination includes a "display member" with "cantilever support means" and "an eyeglass hanger member for mounting a pair of eyeglasses." Both claims further define the structure of the eyeglass hanger member. Claim 1 of the '345 patent describes the eyeglass hanger member as "made from flat sheet material," and having an "opening means formed ... below [its] upper edge." According to claim 1 of the '726 patent, the eyeglass hanger member has "an attaching portion attachable to a portion of said frame of said pair of eyeglasses to enable the temples of the frame [to be opened and closed]." Similarly, claim 2 of the '726 patent encompasses a "method of displaying eyeglass/hanger combinations ... the eyeglass hangers having an attaching portion attached to a portion of the frame of an associated pair of eyeglasses."

Claims 1, 2, and 3 of the '911 patent encompass a "combination of an eyeglass display member and an eyeglass contacting member." The '911 patent further describes the structure of the "eyeglass contacting member" as "having an encircling portion adapted to encircle a part of said frame of said pair of eyeglasses."

The district court construed the "eyeglass hanger member" element of the '345 patent as a means-plus-function claim element subject to § 112, ¶ 6. Accordingly, the district court instructed the jury that "[t]he 'eyeglass hanger member for mounting a pair of eyeglasses' [in claim 1 of the '345 patent] is the body of the hanger disclosed in the '345 patent and its drawings and the structural equivalents thereof." The district court similarly interpreted the "eyeglass hanger member" element of the '726 patent. The district court instructed the jury that "[t]he 'eyeglass hanger member for mounting a pair of eyeglasses' [in claim 1 of the '726 patent] is the hanger disclosed in the '726 patent and its drawings as having a body, an aperture, and an attaching portion and the structural equivalents thereof."

With respect to the '911 patent, the district court concluded that the "eyeglass contacting member" was a means-plus-function element. The district court therefore instructed the jury that the "eyeglass contacting member" is "the hanger disclosed in the '911 patent and its drawings having a body and an aperture and an 'encircling portion', and the structural equivalents thereof."

This court reviews the district court's claim interpretation without deference. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454–56, 46 USPQ2d 1169, 1172–75 (Fed.Cir.1998) (en banc); *Markman*, 52 F.3d at 979–81. This court has delineated several rules for claim drafters to invoke the strictures of 35 U.S.C. § 112, ¶ 6. Specifically, if the word "means" appears in a claim element in combination with a function, it is presumed to be a means-plus-function element to which § 112, ¶ 6 applies. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427, 44 USPQ2d 1103, 1109 (Fed.Cir. 1997); *Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1583, 39 USPQ2d 1783, 1785 (Fed.Cir.1996). Nevertheless, according to its express terms, § 112, ¶ 6 governs only claim elements that do not recite sufficient structural limitations. *See* 35 U.S.C. § 112, ¶ 6. Therefore, the presumption that § 112, ¶ 6 applies is overcome if the claim itself recites sufficient structure or material for performing the claimed function. *See Sage*, 126 F.3d at 1427–28 ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."); *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1574, 40 USPQ2d 1619, 1623 (Fed.Cir.1996); *Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 531, 41 USPQ2d 1001, 1006 (Fed.Cir.1996).

Although use of the phrase "means for" (or "step for") is not the only way to invoke § 112, ¶ 6, that terminology typically invokes § 112, ¶ 6 while other formulations generally do not. *See Greenberg*, 91 F.3d at 1583–84. Therefore, when an element of a claim does not use the term "means," treatment as a means-plus-function claim element is generally not appropriate. *See Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213–15, 48 USPQ2d 1010, 1016–18 (Fed.Cir.1998). However, when it is apparent that the element invokes purely functional terms, without the additional recital of specific structure or material for performing that function, the claim element may be a means-plus-function element despite the lack of express means-plus-function language. *See, e.g., Cole*, 102 F.3d at 531 ("[M]erely because an element does not include the word 'means' does not automatically prevent that element from being construed as a means-plus-function element."); *Mas–Hamilton*, 156 F.3d at 1213–15 (interpreting "lever moving element" and "movable link member" under § 112, ¶ 6).

Under this established analytical framework, the "eyeglass hanger member" elements in the claims of both the '345 and the '726 patents do not invoke § 112, ¶ 6. In the first place, these elements are not in traditional means-plus-function format. The word "means" does not appear within these elements. Moreover, although these claim elements include a function, namely, "mounting a pair of eyeglasses," the claims themselves contain sufficient structural limitations for performing those functions. As noted above, claim 1 of the '345 patent describes the eyeglass hanger member as "made from flat sheet material" with an "opening means formed ... below [its] upper edge." This structure removes this claim from the purview of § 112, ¶ 6. Similarly, according to claim 1 of the '726 patent, the eyeglass hanger member has "an attaching portion attachable to a portion of said frame of said pair of eyeglasses to enable the temples of the frame [to be opened and closed]." This structure also precludes treatment as a means-plus-function claim element. The district court

therefore improperly restricted the "eyeglass hanger member" in these claims to the structural embodiments in the specification and their equivalents.

The district court also erred in interpreting the "attaching portion attachable to a portion of said frame of said pair of eyeglasses" element of claim 1 of the '726 patent as a means-plus-function element. It instructed the jury that the "attachable portion" is "a mechanically fastened loop that goes around the nose bridge of the glasses as disclosed in the specification, or the structural equivalent thereof." Because this claim element is also not in traditional means-plus-function form and supplies structural, not functional, terms, the trial court erred by applying § 112, ¶ 6 to this claim element. This error caused the district court to incorporate unduly restrictive structural limitations into the claim.

For reasons similar to those discussed above with respect to the claim elements of the '345 and the '726 patents, the "eyeglass contacting member" element of the '911 patent claims is also not a means-plus-function element. Again, this claim element is not in traditional means-plus-function form. Furthermore, the claim itself recites sufficient structure for performing the recited function. Specifically, claim 1 of the '911 patent describes the "eyeglass contacting member" as "having an encircling portion adapted to encircle a part of said frame of said pair of eyeglasses to enable the temples of the frame to be selectively [opened and closed]." Similarly, claim 3 of the '911 patent describes the "eyeglass contacting member" as "having an attaching portion attachable to a portion of said frame of said eyeglasses." Therefore, the district court erred by applying § 112, ¶ 6 to these claim elements.

Magnivision also complains that the district court erred in its construction of the language "means for securing a portion of said frame of said eyeglasses to said hanger member" in claim 1 of the '345 patent. With respect to this element, the district court instructed the jury that "[t]he 'means for securing' limitation is a mechanically fastened loop that goes around the nose bridge of the glasses ... or an equivalent thereof." The district court went on, however, to instruct the jury that "[t]he means for securing can be formed from a separate extension or integral extension and includes either the rivet fastener or the button and hole fastener." Magnivision argues that the district court should have included the phrase "or equivalents thereof" after "button and hole fastener" in its instruction to the jury. Absent this and the other claimed errors in the district court's interpretation of claim 1 of the '345 patent, Magnivision argues that the jury would have found literal infringement rather than infringement under the doctrine of equivalents.

The "means for securing" claim element is in conventional means-plus-function format without specific recital of structure and therefore invokes § 112, ¶ 6. The jury's finding of infringement of claim 1 of the '345 patent under the doctrine of equivalents indicates that the jury found every element of the claim literally or equivalently present in the accused device. The question before this court, therefore, is whether the jury's finding that the accused structure was equivalent to the "means for securing" element under the doctrine of equivalents, also indicates that it is equivalent structure under § 112, ¶ 6.

This court has on several occasions explicated the distinctions between the term "equivalents" found in § 112, ¶ 6 and the doctrine of equivalents. *See, e.g., Valmont Indus., Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 1042–44, 25 USPQ2d 1451, 1453–56 (Fed.Cir.1993); *Chiuminatta,* 145 F.3d at 1310; *Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 1222, 40 USPQ2d 1667, 1673–74 (Fed.Cir.1996); *Dawn Equipment Co. v. Kentucky Farms Inc.,* 140 F.3d 1009, 1018–23, 46 USPQ2d 1109, 1115–18 (Fed.Cir.1998) (Plager, J., additional views) (Newman, J., additional views) (Michel, J., additional views). Indeed, the

Supreme Court recently acknowledged distinctions between equivalents as used in § 112, ¶ 6 and the doctrine of equivalents. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 27, 117 S.Ct. 1040, 1048, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1870–71 (1997) ("[Equivalents under § 112, ¶ 6] is an application of the doctrine of equivalents in a restrictive role, narrowing the application of broad literal claim elements. [Section 112, ¶ 6] was enacted as a targeted cure to a specific problem.... The added provision, however, is silent on the doctrine of equivalents as applied where there is no literal infringement.")

Section 112, ¶ 6 recites a mandatory procedure for interpreting the meaning of a means- or step-plus-function claim element. These claim limitations "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. Thus, § 112, ¶ 6 procedures restrict a functional claim element's "broad literal language ... to those means that are 'equivalent' to the actual means shown in the patent specification." *Warner–Jenkinson*, 117 S.Ct. at 1048. Section 112, ¶ 6 restricts the scope of a functional claim limitation as part of a literal infringement analysis. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed. Cir.1987). Thus, an equivalent under § 112, ¶ 6 informs the claim meaning for a literal infringement analysis. The doctrine of equivalents, on the other hand, extends enforcement of claim terms beyond their literal reach in the event "there is 'equiva-

lence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson*, 117 S.Ct. at 1045.

One important difference between § 112, ¶ 6 and the doctrine of equivalents involves the timing of the separate analyses for an "insubstantial change." As this court has recently clarified, a structural equivalent under § 112 must have been available at the time of the issuance of the claim. *See Chiuminatta*, 145 F.3d at 1310. An equivalent structure or act under § 112 cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon its issuance. An "after arising equivalent" infringes, if at all, under the doctrine of equivalents. *See Warner–Jenkinson*, 117 S.Ct. at 1052; *Hughes Aircraft Co. v. U.S.*, 140 F.3d 1470, 1475, 46 USPQ2d 1285, 1289 (Fed.Cir.1998). Thus, the temporal difference between patent issuance and infringement distinguish an equivalent under § 112 from an equivalent under the doctrine of equivalents. *See Chiuminatta*, 145 F.3d at 1310. In other words, an equivalent structure or act under § 112 for literal infringement must have been available at the time of patent issuance while an equivalent under the doctrine of equivalents may arise after patent issuance and before the time of infringement. *See Warner–Jenkinson*, 117 S.Ct. at 1053. An "after-arising" technology could thus infringe under the doctrine of equivalents without infringing literally as a § 112, ¶ 6 equivalent.[2] Furthermore, under § 112, ¶ 6, the accused device must perform the identical function as recited in the claim element

**2.** These principles, as explained in *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 46 USPQ2d 1752 (Fed. Cir.1998), suggest that title 35 will not produce an "equivalent of an equivalent" by applying both § 112, ¶ 6 and the doctrine of equivalents to the structure of a given claim element. A proposed equivalent must have arisen at a definite period in time, i.e., either before or after patent issuance. If before, a § 112, ¶ 6 structural equivalents analysis applies and any analysis for equivalent structure under the doctrine of equivalents collapses

into the § 112, ¶ 6 analysis. If after, a nontextual infringement analysis proceeds under the doctrine of equivalents. Patent policy supports application of the doctrine of equivalents to a claim element expressed in means-plus-function form in the case of "after-arising" technology because a patent draftsman has no way to anticipate and account for later developed substitutes for a claim element. Therefore, the doctrine of equivalents appropriately allows marginally broader coverage than § 112, ¶ 6.

while the doctrine of equivalents may be satisfied when the function performed by the accused device is only substantially the same. *See Cybor,* 138 F.3d at 1456; *Hughes Aircraft,* 140 F.3d at 1475.

■ Although § 112, ¶ 6 and the doctrine of equivalents are different in purpose and administration, "a finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation may preclude a finding of equivalence under the doctrine of equivalents." *Chiuminatta,* 145 F.3d at 1311. Both equivalence analyses, after all, apply "similar analyses of insubstantiality of the differences." *Id.* This confluence occurs because infringement requires, either literally or under the doctrine of equivalents, that the accused product or process incorporate each limitation of the claimed invention. *See Warner–Jenkinson,* 117 S.Ct. at 1049; *Pennwalt,* 833 F.2d at 935. Therefore, if an accused product or process performs the identical function and yet avoids literal infringement for lack of a § 112, ¶ 6

structural equivalent, it may well fail to infringe the same functional element under the doctrine of equivalents. *See Chiuminatta,* 145 F.3d at 1311. This same reasoning may be applied in reverse in certain circumstances. Where, as here, there is identity of function and no after-arising technology, a means-plus-function claim element that is found to be infringed only under the doctrine of equivalents due to a jury instruction failing to instruct on § 112, ¶ 6 structural equivalents is also literally present in the accused device.

VSI's Version 2 hanger tag has a central body and two arms, with one arm extending from each side of the body. Each arm has a hole near the end for receipt of an eyeglasses temple. The body also has an aperture through which a cantilever rod can be placed so the hanger tag can be hung from a display rack. VSI's Version 2 hanger tag is the subject of U.S. Patent No. 5,141,104 (the '104 patent). Figure 4 of the '104 patent illustrates these features.

FIG. 4

As noted above, the doctrine of equivalents and structural equivalents under § 112, ¶ 6, though different in purpose and administration, can at times render the same result. In this case, the jury found infringement under the doctrine of equivalents. This finding presupposes that the jury found an equivalent for each element of the claimed invention, including the "means for securing ." The holes in the arms of VSI's Version 2 hanger tag secure

a portion of the eyeglasses frame (the temples) to the hanger member and therefore perform the identical function of the claim element in question. The jury was instructed that the "means for securing" disclosed in the '345 patent "is a mechanically fastened loop that ... can be formed from a separate extension or integral extension and includes either the rivet fastener or the button and hole fastener." Based on this instruction, the jury found

that the holes in the arms of the Version 2 hanger tag were equivalent to the mechanically fastened loop of the '345 patent under the doctrine of equivalents.

The parties do not dispute that the holes in the arms of the accused device perform a function identical to the extension of the patented device. Furthermore, the holes do not constitute an after-arising technology. Because the functions are identical and the holes are not an after-arising technology, the jury's finding of infringement under the doctrine of equivalents indicates that the jury found insubstantial structural differences between the holes in the arms of the Version 2 hanger tag and the loop of the '345 patent claim element. That finding is also sufficient to support the inference that the jury considered these to be structural equivalents under § 112, ¶ 6. For these reasons, any perceived error in the district court's jury instruction regarding the "means for securing" is, at most, harmless.

■ Magnivision also argues that the district court improperly construed the "opening means" of claim 1 of the '345 patent. The court instructed the jury that "[t]he 'opening means' is the elongated slot having a notch as described and depicted in the '345 patent, and the structural equivalents thereof." Citing *Al–Site Corp. v. Bonneau Co.*, 22 F.3d 1107, 33 USPQ2d 1136, 1139 (Fed.Cir.1994), Magnivision argues that this court has already construed this structure to be "an enclosed hole and equivalents thereof."

For several reasons, Magnivision's reliance on *Bonneau* fails. First, as Magnivision admits, in *Bonneau,* this court construed claim 8 of the '532 patent, not the claims of the '345 patent. These claims have different language and different meanings. Furthermore, Magnivision did not inform the trial court that *Bonneau* was a non-precedential opinion (in which Magnivision lost), which may only be cited for its issue preclusive effect against Magnivision. Finally, in *Bonneau,* Magnivision argued for a broader claim construction than that eventually adopted by this court.

This litigation record gives no reason to think that the court rejected the district court's construction in this case, nor any reason to deny VSI the opportunity to seek a narrower construction. With regard to claim 1 of the '345 patent, the claim element "opening means for receiving cantilever support means and securing a horizontal orientation for the eyeglasses" invokes § 112, ¶ 6, and the district court correctly determined the scope of the claim.

■ In a further attempt to overturn the jury verdict of infringement under the doctrine of equivalents with respect to the '345, '726, and '911 patents, VSI relies on prosecution history estoppel. This court has reviewed VSI's prosecution history estoppel argument and finds it unpersuasive. To overcome prior art objections by the Examiner, Magnivision amended what became claim 8 of the '532 patent to require that the extension project from the bottom edge portion of the hanger tag. Citing *Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291, 36 USPQ2d 1095, 1100 (Fed.Cir.1995), VSI argues that because all of Magnivision's patents arose from related applications, the same prosecution history estoppel applies to them as well. VSI therefore contends that because the arms of its Version 2 hanger tag extend from the sides of the body of the tag, it cannot infringe the claims of these patents under the doctrine of equivalents as restricted by prosecution history estoppel. While in some cases, the prosecution history of a related application may limit application of the doctrine of equivalents in a later filed patent, in this case the specific limitation added in the claims of an earlier issued patent is not present in the claims of the later issued patents. The '345, '726, and '911 patents all have limitations not found in the '532 patent and did not necessarily require the specific limitation added to the claims of the '532 patent to be patentable. The specific limitations added to gain allowance of the '532 patent are not included in and

are therefore not relevant to determining the scope of the claims of the later issued patents.

In sum, the district court erred by interpreting several of the claim elements in the '345, '726 and '911 patents as means-plus-function elements subject to § 112, ¶ 6. Because, properly construed, these claims do not call for interpretation under § 112, ¶ 6, the district court's reading unnecessarily limited their scope. This court has cautioned against incorporating unwarranted functional or structural limitations from the specification into the claims. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277, 35 USPQ2d 1035, 1041 (Fed.Cir.1995). Despite the district court's unwarranted restriction of the claims, the jury found infringement under the doctrine of equivalents. Although a reasonable dispute as to the application of the correctly interpreted claims to the accused structure prevents a determination of literal infringement as a matter of law, because the jury found infringement under the trial court's more restricted reading of the claims, this court need not remand for an infringement determination according to this court's broader claim interpretation. Proceeding claim element by claim element, the jury has already found infringement. This court's correction of the claim scope does not disturb that determination.

### Validity of the '532, '345, '726, and '911 patents

VSI challenges the validity of all four Magnivision patents under 35 U.S.C. § 103. Specifically, VSI asserts that these patents are obvious in light of U.S. Patent No. 3,738,034 (the Seaver patent) or the 1984 B & G catalog and the knowledge of one of ordinary skill in the art. VSI also asserts obviousness based on the Rosen patent (U.S. Patent No. 3,291,300), the Pacelli patent (U.S. Patent No. 3,116,529), and German Design Patent No. G 8,212,-306.3 U1 (the German patent). On appeal, VSI particularly urges that the Cool–Ray catalogs (which depict the commercial embodiment of the Seaver patent), when

viewed with the knowledge of one of ordinary skill in the art, render all of the disputed claims invalid for obviousness. The jury considered and rejected VSI's claims of invalidity.

 Although the determination of obviousness is ultimately a legal conclusion, it rests on underlying factual determinations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966). Issued patents have a strong presumption of validity in infringement proceedings. *See* 35 U.S.C. § 282 (1994). Hence, an accused infringer who defends on grounds of patent invalidity bears the burden of showing patent invalidity by clear and convincing evidence. *See Monarch Knitting Mach. v. Sulzer Morat Gmbh*, 139 F.3d 877, 881, 45 USPQ2d 1977, 1981 (Fed.Cir. 1998).

 In a challenge based on obviousness under 35 U.S.C. § 103, the person alleging invalidity must show prior art references which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention. *See Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810, 106 S.Ct. 1578, 89 L.Ed.2d 817, 229 USPQ 478, 479 (1986); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1364, 47 USPQ2d 1027, 1032 (Fed.Cir. 1998). The "presumption of validity under 35 U.S.C. § 282 carries with it a presumption that the Examiner did his duty and knew what claims he was allowing." *Intervet Am., Inc. v. Kee—Vet Labs., Inc.*, 887 F.2d 1050, 1054, 12 USPQ2d 1474, 1477 (Fed.Cir.1989). Therefore, the challenger's "burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467, 15 USPQ2d 1525, 1527 (Fed.Cir.1990).

 The party seeking patent invalidity based on obviousness must also show some motivation or suggestion to combine

the prior art teachings. *See In re Rouffet,* 149 F.3d 1350, 1355, 47 USPQ2d 1453, 1457 (Fed.Cir.1998); *Motorola,* 121 F.3d at 1472. A suggestion or motivation to combine generally arises in the references themselves, but may also be inferred from the nature of the problem or occasionally from the knowledge of those of ordinary skill in the art. *See Rouffet,* 149 F.3d at 1355.

▮ In this case, the United States Patent and Trademark Office (the PTO) considered nearly all the prior art that VSI asserts renders Magnivision's patents obvious. The PTO considered the Seaver patent during its prosecution of the applications for each of the '345, '726, and '911 patents. The B & G catalog was before the PTO in the application that led to the '911 patent. Moreover, the structure of the B & G reference appears in the Smilow Patent (U.S. Patent No. 3,710,996) which was cited against each of these patents. All of the other references, except the Rosen patent, which is similar to the German patent, were before the PTO in the examinations of one or more of the Magnivision patent applications.

The Seaver patent is the most pertinent prior art. The Seaver patent discloses a security tag for eyeglasses. The Seaver tag is used as an anti-theft device in conjunction with prior art displays. In these displays, the temples of the eyeglasses are not folded, but rather extend through openings in the display. The Seaver security tag is not a hanger display tag and is not designed nor intended to have a cantilevered support extend through it. Neither does the Seaver patent suggest stacking a plurality of folded eyeglasses on a cantilevered support. The Seaver security tag does, however, disclose some elements of the claimed invention, such as a loop that secures the tag to the eyeglasses. Nevertheless, although the Seaver patent discloses some of the elements recited in the Magnivision patents' claims, it does not disclose the display member, the cantilevered support, or the aperture for mounting the hanger tag on the cantilevered support.

▮ VSI argues that it would have been obvious to one of ordinary skill in the art to punch a hole in the Seaver security tag and hang it from a cantilevered support. VSI points to the problems in the art and the Rosen, German, and Pacelli patents to support this conclusion. VSI is unable, however, to point to any specific teaching or suggestion for making this combination. VSI instead relies on what it presumes is the level of knowledge of one of ordinary skill in the art at the time of the invention to supply the missing suggestion to combine. In the first place, the level of skill in the art is a prism or lens through which a judge or jury views the prior art and the claimed invention. This reference point prevents these deciders from using their own insight or, worse yet, hindsight, to gauge obviousness. Rarely, however, will the skill in the art component operate to supply missing knowledge or prior art to reach an obviousness judgment. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553, 220 USPQ 303, 312–13 (Fed.Cir.1983) ("To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher."). Skill in the art does not act as a bridge over gaps in substantive presentation of an obviousness case, but instead supplies the primary guarantee of objectivity in the process. *See Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714, 718, 21 USPQ2d 1053, 1057 (Fed.Cir.1991).

The level of skill in the art is a factual determination. *See Graham,* 383 U.S. at 17–18. Because the jury considered and rejected VSI's challenge on this grounds, it evidently concluded that one of ordinary skill in the art would not have known to make this combination. This factual finding is supported by substantial evidence.

VSI's argument in this regard is therefore an impermissible effort at hindsight recreation. *See Grain Processing Corp. v. American Maize–Prods. Co.*, 840 F.2d 902, 5 USPQ2d 1788, 1792 (Fed.Cir.1988).

The German patent (and the similar Rosen patent) disclose theft-resistant display tags for sunglasses. These display tags are essentially plastic cards with holes for receiving the temples of the sunglasses and another hole for hanging them on a cantilevered support. In some ways, they are similar to the Magnivision patents. In other ways, however, they are quite different. Dr. Chrycy, an expert optometrist, explained that the device disclosed in the German patent would not be suitable as a display tag for reading eyeglasses because it does not allow a person trying them on to determine if they are the correct strength. The plastic card of the German display tag interferes with the proper fit of the eyeglasses and therefore would result in visual distortions or blurring. The Rosen patent has similar drawbacks.

The Pacelli patent also discloses a theft-resistant tag for displaying sunglasses. To secure the glasses, the Pacelli patent uses a sheet of plastic which covers the frame and impairs the view of a person trying on the glasses. Dr. Chrycy testified that this would result in alteration of the view through the lenses and would therefore not serve as a reading glasses display tag.

The B & G catalog primarily discloses belt hangers. Although the catalog discloses possible use of these hangers for eyeglasses, Mr. Hallerman, another expert, testified that they could not be used effectively for holding eyeglasses because they lacked the necessary stability.

Magnivision further supports the jury's factual findings related to nonobviousness with record evidence of secondary considerations. These secondary considerations, such "as commercial success, long felt but unresolved needs, failure of others, etc.," also provide objective proof of nonobviousness. *Dennison*, 475 U.S. at 810. The record shows the commercial success of the claimed invention, including demonstration of a nexus between the commercial success and the patented invention, and evidence of a long felt need for a solution to several of the problems addressed by the invention.

Mort Nyman, an expert in the design, development and marketing of nonprescription reading glasses, testified regarding the problems experienced with prior art eyeglass hangers. He further testified that efforts prior to Magnivision's invention were unsuccessful in solving these problems. Prior art displays were bulky and incapable of displaying several pairs of eyeglasses at the same vertical position. Prior art displays contained openings for insertion of the temples of the eyeglasses and therefore allowed only one pair of eyeglasses per vertical position. Because fewer glasses fit on the prior art displays, vendors had to frequently refill the display rack. Moreover, prior art theft-resistant displays prevented potential customers from effectively trying on the eyeglasses.

Magnivision overcame the deficiencies of the prior art by developing a hanger tag which does not interfere with the opening and closing of the temples or distort the view of the user through the eyeglasses. Furthermore, Magnivision's hanger tags featured an aperture for mounting on a cantilevered support. In this way, several pairs of eyeglasses of the same magnification strength could fit on the display together. Due to this design, store managers no longer needed to frequently refill the eyeglass display rack. For these reasons, the theft-resistant hanger tags disclosed in the Magnivision patents satisfied the long-felt needs of the industry.

Magnivision also presented evidence of commercial success, which further tended to establish the nonobviousness of the claimed inventions. Particularly, Magnivision presented evidence showing that all of the retail chains that sold Magnivision glasses wanted to switch from the prior art displays to Magnivision's patented displays. Magnivision also presented evi-

dence showing that as a direct result of Magnivision's patented inventions, the number of locations selling Magnivision eyeglasses more than doubled. This evidence of commercial success further strengthened the district court's determination that the Magnivision patents were not obvious. The factual findings made by the jury underlying this determination are supported by substantial evidence.

Based on the evidence presented at trial, the jury found that VSI failed to provide clear and convincing evidence of obviousness. Because the finding of obviousness rests on underlying factual determinations, which the jury found adverse to VSI, the district court correctly concluded that the Magnivision patents are not invalid under 35 U.S.C. § 103.

### Trade Dress Infringement

For areas of law, such as trademark and trade dress infringement, which are not unique to this court's jurisdiction, this court applies the law of the pertinent regional circuit, in this case the United States Court of Appeals for the Eleventh Circuit. *See Pro–Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574, 37 USPQ2d 1626, 1631 (Fed. Cir.1996). Under Eleventh Circuit law, a finding of trademark and trade dress infringement is a question of fact. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir.1986). A jury verdict of trademark or trade dress infringement is therefore reviewed for substantial evidence. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973, 219 USPQ 515, 522 (11th Cir.1983). Legal determinations of the district court, however, receive no deference on review. *See Lucero v. Trosch*, 121 F.3d 591, 599 (11th Cir. 1997).

Trade dress protection embraces the total image of the product including such factors as the size, shape, and color of the product's packaging and appearance. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615, 23 USPQ2d

1081, 1082 n. 1 (1992). To prove trade dress infringement, the plaintiff must show: (1) the inherent distinctiveness or secondary meaning of its trade dress, (2) the essential nonfunctionality of its trade dress, *and* (3) the likelihood of consumer confusion as to origin, sponsorship, or approval due to similarity between its and the defendant's trade dress. *See University of Fla. v. KPB, Inc.*, 89 F.3d 773, 776–77, 39 USPQ2d 1603, 1605 (11th Cir. 1996). Because this is a conjunctive test, failure to prove even one of these elements precludes a showing of trade dress infringement. Therefore, the defendant can secure a summary judgment of noninfringement by demonstrating that the plaintiff cannot show any element of the cause of action.

As mentioned above, protection hinges on the distinctiveness or secondary meaning of the trade dress. Distinctive trade dress enables consumers to distinguish a product from others and identify that product with its source. *See id.* at 776 n. 5. The Eleventh Circuit gauges distinctiveness based on whether trade dress "[is] a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Id.* (quoting *AmBrit*, 812 F.2d at 1536). Trade dress can also satisfy this requirement by showing secondary meaning, or a "connection in the consumer's mind between the mark and the product's producer, whether that producer is known or unknown." *Id.* The plaintiff may show secondary meaning in several ways. The plaintiff may show secondary meaning with consumer surveys and with evidence of lengthy and uniform display of the dress. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513, 224 USPQ 552, 555–56 (11th Cir.1984). The plaintiff may also show secondary meaning with evidence of the plaintiff's efforts—usually through ad-

vertising—to establish in the minds of the consumers a connection between the trade dress and its product. *See id.* Finally, the plaintiff may use other evidence showing consumers' association of the trade dress with the plaintiff or its product to prove secondary meaning. *See id.*

■ Trade dress must also be primarily nonfunctional. A trade dress is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606, 214 USPQ 1, 4 n. 10 (1982), such that its protection would place a competitor at a significant disadvantage, *see Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248, 34 USPQ2d 1161, 1165 (1995).

■ Trade dress protection also requires evidence of a likelihood of confusion between the plaintiff's and the defendant's trade dress. Determining whether a likelihood of confusion exists requires weighing several factors: (1) the nature of the plaintiff's mark, (2) the similarity of the marks, (3) the similarity of the products the marks represent, (4) the similarity of the parties' retail outlets and customers, (5) the similarity of the parties' advertising, (6) the defendant's intent to copy or imitate the plaintiff's mark, and (7) the extent of actual confusion. *See Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.,* 833 F.2d 1484, 1488, 5 USPQ2d 1190, 1193–94 (11th Cir.1987).

The jury found that VSI infringed Magnivision's display card and blister pack trade dress, Magnivision's color coding trade dress, and Magnivision's eyeglass styles and colors trade dress. Each of these trade dresses requires separate analysis.

Display Card/Blister Pack Trade Dress

■ Magnivision used a particular display card and blister pack to market its hand-held magnifiers. The display card contains a bold red stripe along its right-hand side and a gray and white cross-hatched background over the remainder of the card. As evidence of distinctiveness of this trade dress, Magnivision presented testimony by Morton Nyman, its president, "that Magnivision is the only company that used this design until it was copied by VSI." Magnivision's use of a display design different from others, however, does not suffice to show distinctiveness in the minds of consumers. Rather, sole use of a design is a preliminary step for a descriptive trade dress to acquire distinctiveness and secondary meaning. *See In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1125, 227 USPQ 417, 422 (Fed. Cir.1985) ("An evidentiary showing of secondary meaning ... includes evidence of the trademark owner's method of using the mark, supplemented by evidence of the effectiveness of such use to cause the purchasing public to identify the mark with the source of the product.").

In this case, Magnivision did not supply evidence of distinctiveness or secondary meaning. Although Magnivision presented some testimony of sole use, the facts belie any acquisition of secondary meaning. A review of some factors related to secondary meaning show the inadequacy of Magnivision's showing. For instance, with regard to the length and manner of the trade dress use, the record shows that Magnivision used its display design for only two years. Moreover, Magnivision discontinued use of the design two years before VSI put their allegedly infringing packaging on the market. With respect to the nature and extent of advertising and promotion—the efforts by the plaintiff to promote a conscious connection in the public's mind between the trade dress and the plaintiff's business—the record shows that Magnivision made significant promotional expenditures. None of these expenditures or activities, however, was tied to the display card trade dress. The record also contained no evidence that consumers actually recognized Magnivision's allegedly distinctive trade dress for hand-held magnifiers.

Without evidence of distinctiveness or secondary meaning beyond its assertion of sole use, no reasonable juror could have found that Magnivision's design had acquired secondary meaning. Hence, Magnivision did not supply enough evidence of this first requirement for trade dress infringement to support the jury's verdict. This conclusion alone precludes a finding of trade dress infringement on the display card. Nonetheless, a brief review of the evidence of likelihood of confusion underscores this court's determination.

As mentioned earlier, the likelihood of confusion analysis requires consideration of several factors. In this case, although the consumers and markets were similar, the packaging was not. Comparison of the two packages shows distinct differences in appearance. Specifically, both the graphics and color scheme are different. VSI's accused packaging does not contain either the bold red stripe or the cross-hatched gray and white background of Magnivision's asserted trade dress. VSI's display card contains a dark black band across the top, with gray and blue stripes covering the remainder of the card. Additionally, VSI's ACURAVISION trademark is prominently displayed in the top black band. Furthermore, VSI's accused display card contains other distinctive features such as a broad blue arrow and MAGNA•DOT trademark under the lens of the magnifier.

Perhaps because of the substantial differences between the accused packaging and Magnivision's asserted trade dress, Magnivision did not produce any evidence of actual customer confusion. The record as a whole lacks evidence to support the jury's finding of a likelihood of consumer confusion.

No reasonable juror could have found trade dress infringement of the display cards. Because the district court based its injunction prohibiting similar display cards on other accessories on the jury's finding of display card infringement, the district court abused its discretion in enjoining the use of the accessory packages.

Color Coding Trade Dress

■ The jury also found that VSI had infringed Magnivision's trade dress in its color coding system. This alleged trade dress is an array of horizontal color-coded stripes on Magnivision's eyeglass hanger tags which identify the power of the glasses. Under this system, the hangers for eyeglasses of a particular power would feature a particular color. Eyeglasses of a different power would hang from a tag with a different color.

■ At the outset, the record does not contain sufficient evidence to show any distinctiveness or secondary meaning for Magnivision's color coding system. Color itself is not inherently distinctive. *See Qualitex*, 514 U.S. at 163 ("[O]ver time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand."). Thus, to support its finding of infringement, the jury must have found secondary meaning in this color-coding system. The record, however, discloses no evidence to support such a finding.

■ Other companies used color coding to market non-prescription reading glasses for many years. Thus, Magnivision has a significant burden to show that its particular color-coding system had acquired source-identifying significance in the minds of the consuming public. Magnivision's burden becomes almost insurmountable in light of the evidence showing that its coloring system changed from time to time. "Absent a specifically defined, color-definite, and *stable* visual appearance, an alleged trade dress cannot receive protection." *Keystone Camera Prods. Corp. v. Ansco Photo–Optical Prods. Corp.*, 667 F.Supp. 1221, 1229, 3 USPQ2d 1797, 1802 (N.D.Ill.1987) (emphasis added).

Although the actual colors Magnivision associated with particular diopter strengths did not change significantly,

Magnivision changed its coding method several times. At various times Magnivision used three different ways to signify diopter strength: the color of the diopter numbers, a horizontal stripe of color across one side of the tag, or a colored rectangle. Without a stable visual appearance and absent any other evidence of consumer identification of the Magnivision's color-coding system, no reasonable juror could conclude that the stripe of color now asserted as a trade dress has acquired secondary meaning.

Furthermore, even if Magnivision could show secondary meaning in its color coding system, color coding cannot act as an indicator of source because it is primarily functional. *See Two Pesos*, 505 U.S. at 775 (trade dress is functional if it "is one of a limited number of equally efficient options available to competitors and free competition would be hindered by according the design trademark protection"); *Spraying Sys. Co. v. Delavan, Inc.*, 762 F.Supp. 772, 781, 19 USPQ2d 1121, 1128 (N.D.Ill.1991), *aff'd*, 975 F.2d 387, 24 USPQ2d 1181 (7th Cir.1992) ("color coding *as an identification system* is clearly functional"). In this case, the record shows that Magnivision used color coding to indicate diopter strength, not to indicate source. Magnivision itself stated that color coding allows the racks to be serviced more easily, aids consumers in selecting the correct diopter, and reduces the time and cost of restocking the glasses. Additionally, as noted earlier, color coding serves these same cost-saving functions for many competitors in the non-prescription eyeglass industry. To give one competitor an exclusive right to practice color-coding would give it a significant advantage over other companies.

Because color coding is primarily functional, the record refutes the jury's verdict of trade dress infringement of Magnivision's color coding system. On the basis of this record, this court concludes that no reasonable juror could have found trade dress infringement of Magnivision's color coding scheme because of the functional nature of the trade dress and the lack of

showing of secondary meaning. This court, therefore, need not proceed to examine the likelihood of confusion. Because the jury verdict of trade dress infringement lacks substantial evidence, the district court abused its discretion by enjoining VSI's use of its hanger tag labels based on trade dress infringement.

Eyeglass Styles and Colors Trade Dress

█ The jury also found that VSI infringed the trade dress of six of Magnivision's eyeglass styles. Once again, however, the record contains insufficient evidence that Magnivision's colors or styles were inherently distinctive or possessed secondary meaning. Mr. Nyman testified that Magnivision purchased its allegedly distinctive styles from publicly available molds. VSI purchased its accused styles from publicly available stock as well. This evidence of the public availability of Magnivision's product raises significant hurdles to a finding that its styles are inherently distinctive as an indicator of source. *See Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1070, 36 USPQ2d 1176, 1180 (2nd Cir.1995) (When similar packaging can be purchased by other companies and is publicly available, "it defies simple logic to suggest that the packaging was inherently distinctive.").

Magnivision produced no evidence of secondary meaning. The record demonstrates that it changed its styles to suit demand. Constantly changing styles rarely demonstrate the stability necessary for the public to identify those particular characteristics with a particular source. *See, e.g., Keystone*, 667 F.Supp. at 1226 (identifying the significant weakness in the plaintiff's trade dress claim as being that the Le Clic "look" was "nothing more than a reflection of the fashion trends taking place generally in the marketplace of youthful consumers."). Thus, the record shows that the publicly available, constantly changing styles of Magnivision's eyeglasses lacked secondary meaning.

Without inherent distinctiveness or secondary meaning, Magnivision's eyeglass styles and colors lacked a protectable trade dress. Absent a protectable trade dress, no reasonable juror could find trade dress infringement.

### Trademark Infringement of the MAGNIVISION mark

The jury found that VSI's mark MAGNA•DOT infringes Magnivision's MAGNIVISION mark. To prove trademark infringement, a trademark owner must show a likelihood that consumers would confuse the defendant's mark with the protected mark. *See Dieter v. B & H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 326, 11 USPQ2d 1721, 1723 (11th Cir. 1989). The Eleventh Circuit identifies several factors which contribute to a likelihood of confusion finding: (1) the nature of the plaintiff's mark, (2) the similarity of the marks, (3) the similarity of the products represented by the marks, (4) the similarity of the retail outlets and consumers, (5) the nature and extent of the parties' advertising, (6) the defendant's intent to copy the plaintiff's mark, and (7) the extent of actual confusion. *See Wesco*, 833 F.2d at 1488; *Coach House Restaurant, Inc. v. Coach and Six Restaurants Inc.*, 934 F.2d 1551, 1561, 19 USPQ2d 1401, 1409 (11th Cir.1991). Other relevant factors include the strength of the marks, the number and nature of similar marks in use on similar goods, the nature and extent of any actual confusion and the length of time during and conditions under which there has been concurrent use without evidence of actual confusion. *See In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973).

Similarity of the marks is a hallmark of consumer confusion. *See E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531, 225 USPQ 1131, 1135 (11th Cir.1985) ("In evaluating the similarity of marks, we must consider ... the appearance, sound and meaning of the marks, as well as the manner in which they are displayed."). In this instance, however, the marks do not present a similar sound, meaning, or commercial impression. The MAGNIVISION mark is a single word; the MAGNA•DOT mark consists of two words separated by a darkened circle. The MAGNIVISION mark has four syllables; the MAGNA•DOT mark has three. The MAGNIVISION mark displays eleven letters, the last seven of which do not appear in the MAGNA•DOT mark; the MAGNA•DOT mark has eight letters and a dot.

The only similarity between the marks is the MAGNA/MAGNI prefix. The record shows, however, that the MAGNA/MAGNI prefix as well as the VISION suffix enjoy wide use in the eyeglass industry on similar goods and services. This evidence included a number of registered trademarks for magnification lenses and eyeglasses (i.e., MAGNA ADD, MAGNA THIN, MAGNA–BAR, MAGNA–COM, MAGNA–LITE, MAGNA–PAGE, MAGNA–RULE, MAGNA–SIGHTER, MAGNATEL, MAGNI–FOCUSER, MAGNI–LENS, MAGNI–SPECS, MAGNI–STAT, MAGNI–VIEWER, COOPERVISION, VALLEN VISION, ACURAVISION, CLEAR VISION, COOP VISION, COYOTE VISION, CRYSTAL VISION, POWER VISION, SELECT–A–VISION, TRUVISION, ULTRAVISION). The common usage of these descriptive terms weighs strongly against a finding of likelihood of confusion. *See, e.g., Sun Banks of Fla., Inc., v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316, 211 USPQ 844, 849 (5th Cir.1981) ("[W]e find the extensive third-party use of the word 'Sun' impressive evidence that there would be *no* likelihood of confusion between Sun Banks and Sun Federal.").

The record shows that these trademarks appeared side-by-side on similar products and in similar retail outlets over a period of several years. Magnivision's own documents allege that MAGNIVISION "has become the generic term for [over-the-counter] reading glasses ." Also, Magnivision made extensive advertising expenditures to promote the recognition of its mark. Nonetheless, the record contains

no showing of actual confusion between the two marks.

The differences in the marks, the absence of actual confusion despite several years of simultaneous use in an identical market, the absence of evidence that VSI intended to copy Magnivision's mark, and the weakness of the descriptive MAGNI-VISON mark add up to a finding of noninfringement as a matter of law. Accordingly, this court holds that no reasonable juror could have found infringement of the MAGNIVISION trademark by the MAGNA•DOT mark.

### Unfair Competition

 Because the only evidence of unfair competition in this case was Magnivision's claims of trademark and trade dress infringement, the jury's finding of unfair competition lacks substantial evidence. Unfair competition provides an additional degree of protection above that provided by trademark and trade dress law. *See Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186, 226 USPQ 123, 130 (11th Cir.1985). Although trademark and trade dress infringement may be the basis for a claim of unfair competition, it frequently requires the court to examine additional conduct that would not give rise to a claim of trademark infringement. *See id.*

In this case, the only evidence in support of the unfair competition claims was the trademark and trade dress infringement claims. As stated earlier, no reasonable juror could find a likelihood of confusion between the trade dress and trademarks of VSI and Magnivision. Therefore, on the evidence presented, no reasonable juror could find that VSI engaged in unfair competition with Magnivision.

### Personal Liability of Myron Orlinsky

 Title 35 authorizes a finding that an officer of a corporation is personally liable for the corporation's acts of infringement. *See* 35 U.S.C. § 271(a) (1994); *Manville Sales Corp. v. Paramount Sys.,*

*Inc.*, 917 F.2d 544, 552, 16 USPQ2d 1587, 1593 (Fed.Cir.1990). Personal liability under § 271(a), however, requires sufficient evidence to justify piercing the corporate veil. *See id.* The corporate entity deserves respect and legal recognition unless specific, unusual circumstances justify disregarding the corporate structure. *See id.* The most common reason for disregarding the corporate structure is that the "corporation was merely the alter ego of its officers." *Id.*

 The record shows that Myron Orlinsky made the sole decision to continue using the hanger tags after VSI received cease and desist letters from Magnivision. The record, however, shows no further evidence of personal activity by Mr. Orlinsky. This evidence does not establish that Mr. Orlinsky overstepped his authority as CEO of VSI. Rather the record shows that Mr. Orlinsky acted consistent with his authority as CEO. Therefore, the record only supports the conclusion that Mr. Orlinsky acted within and according to the strictures of the corporate structure. The record shows no instance of the corporation operating as Mr. Orlinsky's alter ego. Thus, the record contains no evidence to justify piercing the corporate veil. *See, e.g., id.* at 553 ("Although these facts support the conclusion that the officers had knowledge of their acts, these acts were within the scope of their employment and thus were protected by the corporate veil.")

Furthermore, after VSI received the cease and desist letter, Mr. Orlinsky consulted counsel before continuing to produce the Version 1 and 2 hanger tags. The record thus shows that Mr. Orlinsky acted pursuant to a good faith belief of noninfringement engendered by advice of counsel. Once again, this evidence does not justify rejecting legal recognition of the corporate structure. *See id.* at 553. In sum, the record does not contain sufficient evidence that Mr. Orlinsky acted outside of the scope of his employment or that he continued to manufacture the hanger

tags knowing that they infringed Magnivision's patents.

## IV.

In conclusion, although the district court erred in its construction of the claims of the '345, '726 and '911 patents, these errors were harmless because of the jury's finding of infringement under the doctrine of equivalents. This court therefore affirms the district court's decision not to grant judgment as a matter of law of non-infringement. The jury's findings with respect to trademark and trade dress infringement, however, are unsupported by substantial evidence. Furthermore, because the finding of unfair competition rested solely on the findings of trademark and trade dress infringement, that finding is also unsupported by substantial evidence. The district court therefore erred in failing to grant judgment as a matter of law that VSI did not infringe Magnivision's asserted trademark and trade dress and that it did not engage in unfair competition. This court therefore reverses the decision of the district court not to grant judgment as a matter of law with respect to the absence of trademark and trade dress infringement and the absence of unfair competition. Additionally, because the jury findings of trademark and trade dress infringement and unfair competition lacked substantial evidence, the district court's entry of a permanent injunction was an abuse of discretion. The district court's entry of the permanent injunction is thus vacated to the extent it prohibited VSI from using its accused trademark, display cards and hanger tag color coding scheme. Furthermore, there is insufficient evidence to support holding Mr. Orlinsky personally liable for the damage award. The district court's conclusion to the contrary is therefore reversed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART and RE-VERSED–IN–PART.*