KWIK PRODUCTS, INC., Plaintiff,

v.

NATIONAL EXPRESS, INC., CMD Products, George E. Allis, Torvian, Inc., Alex J. Phinn, Jr., and Griff and Associates, L.P., Defendants.

No. 03 Civ. 9291(DC).

United States District Court, S.D. New York.

Feb. 7, 2005.

Hedman & Costigan, P.C., By: Kenneth F. Florek, Katharine G. Loving, New York, N.Y. and Casella & Hespos, LLP, By: Anthony J. Casella, New York, NY, for Plaintiff.

Klehr Harrison Harvey Branzburg & Ellers, LLP, By: Don P. Foster, Randi Lynne Rubin, Philadelphia, PA and Blank Rome LLP, By: Leonard S. Steinman, New York, NY, for Defendants.

### OPINION

CHIN, District Judge.

In this patent infringement case, plaintiff Kwik Products, Inc. ("Kwik"), a manufacturer of vegetation string trimmer heads, alleges that defendants infringed its patent, U.S. Patent No. 5,896,666 (the "'666 Patent"). Defendants counterclaim, contending that the '666 Patent is invalid. The case was tried to the Court without a jury in October 2004. For the reasons that follow, judgment will be entered in favor of defendants on the infringement claims and in favor of Kwik on the invalidity counterclaim. Pursuant to Fed.R.Civ.P. 52(a), my findings of fact and conclusions of law follow.

### STATEMENT OF THE CASE

#### A. The Facts

##### 1. Vegetation Trimmers

Vegetation trimmers are outdoor power tools used to cut grass, weeds, and other vegetation. They are powered by gasoline or electricity and feature a cutting head that spins a blade or string, at speeds up to 10,000 rpm. The heads are replaceable and a market exists for replacement trimmer heads. For many years, the string trimmers came principally in two versions: spool and weave. The spool systems used spools of coiled string in the head, with one end extending out and the string advanced by manual or automatic activation. Examples included "tap and go" or "bump and feed" devices that required the user to tap or bump the bottom of the head on the ground to advance the trimmer line from the spool. The weave systems used a string woven through a predetermined path or channel in the trimmer head and then extending out. (PTO ¶¶ 12, 13, 14, 15; 10/12/04 Tr. at 28; 10/13/04 Tr. at 121).[1]

These systems had drawbacks. The string trimmers were cumbersome, time-consuming, and hard to load. The coil systems required the user to wind string around a spool. The weave systems re-

---

dants' exhibits received into evidence at trial. References to "PTO" are to the stipulated facts contained in the parties' joint pretrial order. Plaintiff's and defendants' post-trial proposed findings of fact and conclusions of law are referred to as "Pl. PFFCL" and "Def. PFFCL," respectively.

quired the user to weave lines of string through the trimmer head, including around posts. The blade systems required the user to affix the blade to a trimmer head with a bolt. The blades also presented a potential danger, as they sometimes broke off upon hitting a hard surface, such as a rock. (10/12/04 Tr. at 27–29; 10/13/04 Tr. at 120–22).

Over the years, customers complained about the drawbacks in the various vegetation trimmer systems. Certainly by the mid–1990s, there was a demand for a better trimmer head—one that could be more easily loaded and replaced. (10/12/04 Tr. at 30–31).

### 2. *Kwik and the '666 Patent*

Kwik has been in the business of manufacturing vegetation trimmer heads since 1997 or 1998. Kwik was started by Fernando Iacona and his brother. Iacona had been working with power tools since he was a twelve-year old apprentice at a hardware store repairing outdoor power equipment. After graduating from high school in 1984, he opened a lawnmower shop in Flushing, New York, with his brother, and worked for years selling and repairing power tools, including vegetation trimmers. (10/12/04 Tr. at 22–27, 36; PTO ¶ 16).

In 1996, Iacona and his brother conceived of an idea for a quick-loading trimmer head. They developed a prototype that used two eight-inch sections of a hard plastic "string" inserted into opposite sides of a "head," with each piece of string held in place by a clamping member mounted on a post and connected to a spring. The string could be easily loaded, and therefore easily replaced, while still being held firm-ly in place when the head was spinning at a high speed. (10/12/04 Tr. at 27, 31–32; PX 1; PTO ¶¶ 9, 17).

In June 1996, the Iacona brothers met with a patent attorney, Anthony J. Casella, Esq. On August 23, 1996, Casella submitted an initial application to the United States Patent and Trademark Office (the "Patent Office") for a patent on the trimmer head invention. The Iaconas thereafter submitted a continuation application as well. (PTO ¶¶ 18, 19; 10/12/04 Tr. at 32–34).

The first application was granted and U.S. Patent No. 5,758,424 (the " '424 Patent") was issued on June 2, 1998. The continuation application was granted and the '666 Patent, the patent in suit, was issued on April 27, 1999. (PTO ¶¶ 19, 20; PXs 2, 3).

The '666 Patent is entitled "Head for String Trimmer." Claims 1–10 and 15–19—the claims at issue in this case [2]—provide as follows:

1. A combination of a cutting head and string for cutting and trimming vegetation, said combination being selectively rotationally driven through a drive shaft, said combination comprising:

at least one generally straight length of string, each said string having two ends and an intermediate portion extending therebetween;

a cutting head selectively rotationally driven by the drive shaft, said head having a base plate and a side wall, said base plate defining a periphery, said side wall extending from said periphery, said base plate and said side wall collectively defining a volume, said side wall being formed with at

---

**2.** The parties dispute whether the invalidity of claims 3–14 and 16–19 are properly in issue, as Kwik argues that defendants only pled inequitable conduct as a basis for their invalidity counterclaim. (*See* 10/21/04 Tr. at 85; Def. PFFCL at 39 n. 6; Pl. Reply to Def. PFFCL at 24). Kwik's objection is overruled and I will consider defendants' claim of invalidity as to all the disputed claims.

least one aperture corresponding to each said string, wherein each said string is disposed to extend through a single said aperture with one said end of each said string being disposed in said volume defined by said base plate and said side wall; and

at least one clamping means for selectively fixing each said string to said head.[3]

2. A combination as in claim 1, wherein each said clamping means includes a pivotally mounted clamping member and a pressing wall aligned to cooperatively clamp the string.

3. A combination as in claim 2, wherein each said clamping member being formed with a center of gravity disposed between said pivotal mounting of said clamping member and cooperating pressing wall.

4. A cutting head for a string trimmer, said cutting head for accommodating at least one piece of string, the string being fixedly supported in said cutting head, said cutting head comprising:

base plate, said base plate defining a periphery;

a side wall extending from the periphery of said base plate, said side wall formed to define at least one aperture;

at least one wall means corresponding to each said aperture, each said wall means for at least partially supporting a single piece of the string, each said wall means disposed adjacent a single said aperture;

at least one clamping member corresponding to each said aperture, each said clamping member being pivotally mounted adjacent a single said aperture and opposite a single said wall means, each said clamping member having a contact surface for engagement with said opposing wall means; and

at least one biasing means corresponding to each said clamping member, each said biasing means for both urging a single said clamping member into contact with a corresponding opposing said wall means, and urging said contact surface of said clamping member in a direction towards said aperture into engagement with an opposing said wall means, wherein each pair of said clamping member and said opposing wall means fixedly supports a single piece of the string in said cutting head.

5. A cutting head as in claim 4, wherein at least one said biasing means includes a coil spring.

6. A cutting head as in claim 4, wherein at least one said biasing means includes a torsional spring.

7. A cutting head as in claim 4, wherein the center of gravity of each said clamping member is located between said pivotal mounting of said clamping member and said opposing wall means.

8. A cutting head as in claim 4, wherein at least one said clamping member is formed as a cam.

9. A cutting head as in claim 4, wherein at least one said clamping member is formed as a cylindrical rod.

10. A cutting head as in claim 4, wherein at least one said wall means is formed continuously with said side wall and extends inwardly from said side wall.

. . . . .

3. Claim 1 of the '666 Patent, as issued, corresponded identically to claim 28 of the application for the '424 Patent. Claim 28, however, was disallowed because of prior art references. The file wrapper histories for the two patents do not indicate why claim 28 of the '424 Patent was disallowed while the identical claim 1 of the '666 Patent was allowed. (10/21/04 Tr. at 3).

15. A cutting head for a string trimmer, said cutting head for accommodating at least one piece of string, the string being fixedly supported in said cutting head, said cutting head comprising:

a base plate, said base plate defining a periphery;

a side wall extending from the periphery of said base plate, said side wall formed to define at least one aperture;

at least one wall means corresponding to each said aperture, each said wall means for at least partially supporting a single piece of the string, each said wall means disposed adjacent a single said aperture;

at least one clamping member corresponding to each said aperture, each said clamping member being pivotally mounted adjacent a single said aperture and opposite a single said wall means, each said clamping member having a contact surface for engagement with the string; and

at least one spring corresponding to each said clamping member, each said spring urging said contact surface of said clamping member in a direction towards the opposing wall means and said aperture, which is adjacent said clamping member, and wherein each pair of said clamping member and said opposing wall means fixedly supports a single piece of the string in said cutting head.

16. A cutting head as in claim 15, wherein the center of gravity of each said clamping member is located between said pivotal mounting of said clamping member and said opposing wall means.

17. A cutting head as in claim 15, wherein at least one said clamping member is formed as a cam.

18. A cutting head as in claim 15, wherein at least one said clamping member is formed with a plurality of spaced ribs.

19. A cutting head as in claim 15, wherein at least one said wall means is formed continuously with said side wall and extends inwardly from said side wall.

(PX 3).

At some point, Iacona acquired his brother's rights to the '666 Patent. Eventually, Iacona assigned the '666 Patent to Kwik, and Kwik currently is the sole owner of all rights to the '666 Patent. (PTO ¶ 8; 10/12/04 Tr. at 35–36).

Kwik began manufacturing its easy-load trimmer head—the commercial embodiment of the invention covered by the '666 Patent—in 1998. (10/12/04 Tr. at 37–38; PX 5). Its trimmer head is sold both as part of a complete power trimmer and separately as a replacement head. For example, Kwik's trimmer head is sold as a "Rapid–Loader" replacement string trimmer cutting head under the Echo brand name and it is also sold on original trimmers made by Echo as well. Echo is the largest trimmer manufacturer in the country. Kwik's product has also been marketed by Briggs and Stratton, another substantial outdoor power equipment company. According to its label, Kwik's Rapid Loader also fits trimmers made by Black & Decker, Craftsman, Homelite, Husqvarna, John Deere, Sears, Stihl, Toro, and Weedeater, among others. (10/12/04 Tr. at 38–39, 47–48, 80–81; PX 5).

Kwik's easy-load trimmer was received well in the market. When it was introduced, there was no other trimmer head that loaded as easily or quickly. (10/12/04 Tr. at 37, 43).

### 3. *Defendants and Their Products*

Defendant George E. Allis spent most of his professional life in the floor and wall

covering business. In the late 1990s, he conceived of an idea for using velcro to fasten a shower curtain to a wall. In the course of pursuing that idea he met defendant Alex J. Phinn, Jr., and eventually began doing some work for Phinn and defendant Torvian, Inc. (10/13/04 Tr. at 71–74, 137, 146).

In 1998, Allis began a landscaping business with his brother. (10/13/04 Tr. at 74). Allis was dissatisfied with the vegetation trimmers that were available on the market and he developed an idea for a trimmer head using a looped line device. (10/13/04 Tr. at 74–75, 94–96; PX 32; PTO ¶¶ 26, 27). He offered the looped line idea to Phinn and others in 1999 and 2000, but the looped line device was never marketed. (10/13/04 Tr. at 75–77, 165; PTO ¶ 28).

Later in 2000, Allis met again with Phinn about his looped line vegetation trimmer head, and this time representatives of a power tool company, Shakespeare, were present as well. At the meeting, the Shakespeare representatives showed Allis a Kwik trimmer head and compared his device to the Kwik head. The different heads were taken outside and tested on the grass. The Kwik head loaded more quickly and easily. (10/13/04 Tr. at 77–80, 96–98, 146; PTO ¶ 30).

In August or September 2000, after the meeting with Shakespeare and Phinn, Allis purchased a Kwik trimmer head (the Echo Rapid–Loader) and took it apart. The Kwik device reminded him of a one-way gripping device that he had seen in his youth. He looked for and found the device, which was sold under the name "Gripple"—this was a one-way gripping device used to hold or splice wires that was loaded simply by inserting a wire into the opening. (10/13/04 Tr. at 80–84, 98–100, 101–04; DX 95).

Allis then developed his own spring-biased trimmer head. When he did so, he had both the Kwik device and the Gripple device in front of him, and the Kwik device influenced the design of his own device. He was aware of the locking mechanism of the Kwik device when he designed his own device, and indeed he was impressed with the Kwik device. In the meantime, he had also found the Iacona patents and reviewed them. He did not want to infringe on the Iacona patents and thus he sought to ensure that his device and the Kwik device did not work in the same way. His design used a spring-biased, slideable clamping member to hold straight lengths of trimmer line in place. (10/13/04 Tr. at 80–84, 105–06; PTO ¶ 32; see PX 35; DX 3).

Allis tried out his spring-biased device, using a Grass Gator trimmer head. He created a rough prototype, prepared drawings, and then commissioned a machine shop to do another prototype. (10/13/04 Tr. at 107–11; DX 3). After discussions with another company about manufacturing and distributing his trimmer, he returned to Phinn, who in turn contacted defendant CMD Products ("CMD"). (10/13/04 Tr. at 111–15, 170–72).

On August 17, 2001, Allis submitted a provisional patent application for his device to the Patent Office. (10/13/04 Tr. at 76, 118, 129; DX 36). He contacted counsel, and on July 24, 2002, counsel gave him an opinion that his device did not infringe any patent, including the '666 Patent. (PTO ¶ 39; PX 46; DX 25; 10/14/04 Tr. at 70–71). On August 20, 2002, with the assistance of counsel (and financial assistance from Phinn), Allis applied to convert his provisional application to an application for a utility patent. (10/13/04 Tr. at 118–19, 129–30, 169–70; 10/14/04 Tr. at 91–93; DXs 26, 27, 38). The '666 and '424 Patents were disclosed to the Patent Office as part of the process. (10/13/04 Tr. at 101; 10/14/04 Tr. at 101–02; PTO ¶ 42).

On June 24, 2003, the Patent Office issued U.S. Patent No. 6,581,292 (the "'292

Patent"), entitled "Vegetation Trimmer Apparatus," covering the Allis invention. (DX 26). The '292 Patent was issued over the cited references to the '666 and '424 Patents, among others. (10/13/04 Tr. at 104, 107; 10/14/04 Tr. at 106; DX 26 at 00312; PTO ¶ 43). Defendants also applied for and eventually obtained a patent for the Allis device in Australia. Applications are pending in Canada, Europe, and South Africa. (10/14/04 Tr. at 106–08; Def. PFFCL at 16 n. 2).

Eventually, the Allis device was marketed commercially as the Grass Gator "Load n' Cut" through and by defendants Phinn, CMD, Griff and Associates, L.P., Torvian, and National Express, Inc. (10/13/04 Tr. at 111–15, 147, 163; 10/14/04 Tr. at 7–10, 22, 55–57; PX 6; PTO ¶¶ 36, 38, 48, 49, 50, 67).

#### 4. *A Comparison of the Allis Device to the '666 Patent*

The '666 Patent describes the preferred embodiment of the invention as a cutter head, rotationally driven by a motor, that spins strings at a velocity sufficient to cut vegetation. (PX 3 at col. 4). The head has apertures at opposing locations, equally spaced apart so that the cutting head remains balanced as it rotates during use. (*Id.*). Strings of fixed length are inserted into the apertures and forced between a cam (or clamping member) and a pressing wall. (*Id.* at cols. 4–5).[4]

The cam pivots and has a center of gravity between the pivot point and the clamping point. (10/21/04 Tr. at 58; PX 3 at Fig. 3). In Figure 3 to the '666 Patent, the cam is item 36, and it rotates on the pivoting post (item 38), pressing the string (item 14) against the pressing wall (item 32). The center of gravity of the cam is denoted by the letters "CG," and a spring (item 40) biases the cam so that it will rotate in a certain direction. The spring has one end secured to the cam and the other end secured to a bracket in the side wall. (10/21/04 Tr. at 59; PX 3 at col. 4 & Fig. 3).

The following is Figure 3 in the '666 Patent:

---

4. "Clamping" is a function by which two members are brought together by a force to frictionally hold something between them. Here, one clamping member was the cam and the other was the pressing wall. As the cam is forced (by the spring) toward the pressing wall, the string is held in place. (*See* 10/21/04 Tr. at 101–04).

FIG. 3

The '666 Patent explains that "[t]he cams are formed and mounted onto the posts so that the center of gravity of each of the cams is located at a point between the corresponding post and the pressing wall. . . ." (PX 3 at col. 4; *see also* PX 3 at Claim 16 ("A cutting head as in claim 15, wherein the center of gravity of each said clamping member is located between said pivotal mounting of said clamping member and said opposing wall means.")). The center of gravity is significant, as the '666 Patent explains, because "[t]he rotation of the cutting head during use . . . creates a centrifugal force which acts on the centers of gravity of the cams to come into tighter engagement with the strings." (*Id.* at col. 5). If the center of gravity is moved, the clamping force derived from the centrifugal force head changes. (10/21/04 Tr. at 62–65).

The '666 Patent describes a second embodiment that uses a torsional spring instead of a coil (extension) spring, as shown in Figure 4, which is reproduced below.[5] The torsional spring (44) is placed onto the post (38) first, with the cam (36) placed over it; one end of the spring (46) is secured to the head itself (30) and the other end is secured to the cam (48). (*Id.* at col. 5 & Fig. 4). The second embodiment then operates in the same manner as the first. (*Id.* at col. 5).

5. A torsion (or torque) spring is wrapped around something; when the spring is rotated, it applies force rotationally as it seeks to resist the rotation. A coil spring can be a compression or extension spring; a compression spring is compressed and applies force linearly in an outward direction as it seeks to return to its original (uncompressed) position, while an extension spring is extended and applies force linearly in an inward direction as it seeks to return to its original (unextended) position. (*See* 10/21/04 Tr. at 66–68, 81).

FIG. 4

In the commercial embodiment of the '666 Patent, the spring is a torsion spring inserted over the post. The clamping member—or cam—has a hole in it and it is also placed on to the post, on top of the spring. The clamping member rotates on the post. The center of gravity of the clamping member is between the post and a pressing wall. The clamping member is notched, and one end of the spring is inserted into the notch. The clamping member also has one-way sharp ridges (or teeth) on one side. As the string is inserted, the spring applies pressure onto the clamping member, which in turn applies pressure onto the string, which in turn is forced against the pressing wall. As the string slides in, the one-way ridges permit the string to come in but prevent the string from sliding back out. As the head is spun when the trimmer is turned on, the centrifugal force places additional force on the clamping member, helping to hold the string in place. The one-way ridges permit the string to be pushed further in and then out through another aperture in the center of the trimming head, allowing the string to be removed. (10/12/04 Tr. at 58–62, 65–69; 10/13/04 Tr. at 122–23, 125–27; 10/21/04 Tr. at 25–26, 75–76; DX 4).

In the Allis device, the spring is a compression spring that is placed flat into a channel in the head. The clamping member has a slot in it instead of a hole; the clamping member is placed onto the post and slides back and forth. The pin and slot act together to restrict the movement of the clamping member. The clamping member is not placed over the spring, as in the Iacona device, but adjacent to the spring. The channels in the head hold the spring and clamping member in place. As the spring compresses, it puts pressure on the clamping member, which in turn is pressed against the string. As the hard plastic string is inserted, the one-way ridges permit it to slide in but prevent it from being pulled back out. In other words, while the clamping member in the Iacona device sits on top of a torsion spring and rotates on a post, the clamping member in the Allis device sits in a channel adjacent to a compression spring and slides back and forth. The motion is a linear motion and the center of gravity of the clamping member does not influence the clamping force. Like the Iacona device, the Allis device uses centrifugal force, although the centrifugal force is not influenced by the location of the center of

gravity. (10/13/04 at 122–23, 125–27; 10/21/04 Tr. at 26, 58–65, 72–73, 113–18; DX 4).

The Iacona device is more difficult to assemble. It involves the use of an eyelet and a metal post. Both the torsion spring and the clamping member must be placed onto the post, and the two must be manipulated with the end of the spring placed into the slot on the clamping member and the components then further manipulated so that pressure is put on the clamping member by the spring working in combination with two walls of the shell. (10/12/04 Tr. at 41–43; 10/21/04 Tr. at 76–77). The Allis device is easier to assemble. The spring is placed into a channel, and then the clamping member is placed into a slightly larger adjacent channel over the post (which is molded into the head). The different springs require different structures. (10/13/04 Tr. at 126–27; 10/21/04 Tr. at 67–68).

The following are photographs of portions of the Iacona device (on the left) and the Allis device (on the right):

 

In the photograph of the Iacona device, the torsion spring is underneath the cam.

### 5. *The Prior Art*

U.S. Patent No. 4,043,037 (the "Okamoto Patent") was issued on August 23, 1977. It describes a "cord-type mowing tool" that uses a rotating cutter head from which is extended at least one fixed length of "cord" that serves as "a grass cutting blade." (DX 36 at 01103). The cord is inserted into an aperture in the cutting head and held in place by a "clamping member having an externally threaded portion and an upper end portion." (*Id.* at col. 4). The cord is held in place by a threaded clamping member that is screwed into another threaded clamping member. (*Id.* at cols. 2, 4 & Fig. 2).

U.S. Patent No. 4,062,114 (the "Luick Patent") was issued on December 13, 1977.

It describes a "vegetation cutting apparatus" that uses "a relatively flexible monofilament cutting element of finite length." (DX 37 at 1108). The inventors sought to address the problem of the "somewhat complex and time consuming" process of replacing the monofilament cutting elements in spool trimmers. (*Id.* at col. 1). The Luick Patent describes a cutting element (a fixed length of monofilament) to which an "abutment" is attached; the cutting element is threaded into a passage that opens on one side of the cutting head and out the other side, where the passage becomes smaller; the abutment prevents the cutting element from falling out. (*Id.* at col. 6 & Figs. 3, 4). Different embodiments of the invention are offered. (*Id.* at cols. 4–5).

U.S. Patent No. 4,199,926 (the "Petty Patent") was issued on April 29, 1980. It

describes a "grass cutter and mulcher for rotary lawn mower" that utilizes a "plurality of flexible rods" extending outward from a disc. (DX 38 at 1116). The disc is rotated by the mower, and as the rods are spun, they cut the grass. They are secured to the disc with screws. (*Id.* at col. 3 & Fig. 3).

U.S. Patent No. 4,301,642 (the "Thurber Patent") was issued on November 24, 1981. It covers a "safety rotor for mower" and is intended to replace "a conventional mower blade" with "strands" of "a tough and strong material" such as nylon or a monofilament. (DX 39 at p. 1 & cols. 2, 3). It uses "spools" of line that supply the strands that extend outward. (*Id.* at col. 5). The invention uses a spring biased "weight" that moves radially back and forth, but this is part of an arrangement for an "automatic feed of strands." (*Id.* at col. 3).

The prior art also includes numerous patents, dating back many years, disclosing spring biased clamping means for holding a string or line or cord or rope or wire. (*See, e.g.*, DXs 30 (1871 patent for clothes line fastener), 31 (1890 patent for line puller), 32 (1917 patent for clamp for ropes, cords, straps, etc.), 33 (1927 patent for cord and rope holder), 34 (1943 patent for wire or rod connector or clamp), 35 (1959 patent for line holder), 40 (1988 patent for cam lock with positive release), 41 (1992 patent for cam cleat), 42 (1996 patent for self-locking cleat for rope, cable, and the like), 43 (1993 international patent for locking apparatus for string); *see also* 10/21/04 Tr. at 87–89).

On February 18, 2003, after the '666 and '424 Patents were issued, the Patent Office issued U.S. Patent No. 6,519,857 (the "Proulx Patent") covering a "fixed line head for flexible line rotary trimmers" in which "two relatively short fixed lengths of flexible cutting line are inserted into opposing channels in the head and are se-

cured by a pair of spring biased toothed cams ... pivotally mounted on a post." (DX 63 at 2192). The Proulx Patent described a pivotally mounted spring biased clamping member; the only significant difference between this patent and the '666 Patent is that in the Proulx patent the pivot is the same location as the center of gravity of the clamping member. (10/21/04 Tr. at 91–92).

### B. *Prior Proceedings*

This action alleging infringement of the '666 Patent was commenced on November 21, 2003. An amended complaint was filed on April 28, 2004. On May 28, 2004, defendants filed their answer to the amended complaint and asserted a counterclaim for a declaratory judgment of invalidity and unenforceability.

The parties waived their right to a jury and submitted a joint pretrial order. Kwik limited its claim of infringement to Claims 1, 2, and 15 of the '666 Patent. The Court tried the case without a jury on October 12, 13, 14, and 21, 2004, and reserved a decision. The parties thereafter submitted proposed findings of fact and conclusions of law.

### *DISCUSSION*

Kwik alleges that the Allis device infringes Claims 1, 2, and 15 of the '666 Patent. Defendants contend that Claims 1–10 and 15–19 of the '666 Patent are invalid. I address first Kwik's claims of infringement and second defendants' counterclaim for invalidity.

### A. *Kwik's Claims: Patent Infringement*

#### 1. *Applicable Law*

A two-step analysis is required in considering patent infringement claims. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d

1448, 1454 (Fed.Cir.1998). First, the court construes the patent by determining the scope and meaning of the patent claims asserted. *Id.* (citing *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 371–73, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). Second, the claims, as construed, are compared with the accused device to determine if an infringement occurred. *Id.; see also Amgen Inc. v. Hoechst Marion Roussel,* 314 F.3d 1313, 1324 (Fed.Cir.2003).

### a. *Construction*

The construction of a patent is a question of law for the court. *Markman,* 517 U.S. at 372, 116 S.Ct. 1384. Patent construction lies within the province of the court because the judge, based on his or her training and discipline, is generally more qualified than a jury to interpret patent terms. *Id.* at 388–89, 116 S.Ct. 1384.

A patent consists of a written description called the specification, which is usually accompanied by drawings, and the claims. The claims are at the end of the patent and define the invention. 35 U.S.C. § 112; *Markman,* 517 U.S. at 373, 116 S.Ct. 1384. A claim may be independent or dependent. 35 U.S.C. § 112. A dependent claim refers to a claim previously set forth and specifies an additional limitation of the invention. *Id.*

In determining claim construction, the court first considers intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The court can rely on extrinsic evidence only in the event that intrinsic evidence alone does not resolve the ambiguities. *Id.* at 1583.

Intrinsic evidence includes the language of the patent—including the claims and specifications—and the prosecution history. *Id.* at 1582; *Hsin Ten Enter. USA, Inc. v. Clark Enters.,* 149 F.Supp.2d 60, 63 (S.D.N.Y.2001). "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir. 1996) (citations omitted). "There is a heavy presumption in favor of the ordinary meaning of claim language." *Kraft Foods, Inc. v. International Trading Co.,* 203 F.3d 1362, 1366 (Fed.Cir.2000) (internal quotation omitted).

In construing a claim, the court may not import an additional limitation into the claim. It is an entirely appropriate practice, however, for the court to look to the specification to aid its interpretation. *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 93 F.3d 1572, 1578 (Fed.Cir.1996) (citation omitted). "Although the written description may aid in the proper construction of a claim term, limitations, examples, or embodiments appearing only there may not be read into the claim." *Kraft Foods,* 203 F.3d at 1366.

The court may also consider the patent's prosecution history—that is, the record of proceedings before the Patent and Trademark Office. *Vitronics,* 90 F.3d at 1582. Although the prosecution history may be used to assist in construing the claims, it may not " 'enlarge, diminish, or vary' the [claim] limitations." *Hsin Ten,* 149 F.Supp.2d at 63 (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)).

If intrinsic evidence, alone, is not sufficient to resolve all claim disputes, the court looks to extrinsic evidence. *Vitronics,* 90 F.3d at 1583; *Hsin Ten,* 149 F.Supp.2d at 64. Extrinsic evidence is evidence outside the patent language and file, including expert and inventor testimony, dictionaries, and treatises. *Key*

*Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed.Cir.1998) (citing *Markman*, 52 F.3d at 980). The court, in its own discretion, may consider extrinsic evidence for background and education, but it may not use such evidence to contradict the terms in the claims. *Key Pharms.*, 161 F.3d at 716 (citing *Markman*, 52 F.3d at 980–81).

Patents must meet the statutory enablement requirement. *See* 35 U.S.C. § 112, ¶ 1. Accordingly, terms must be interpreted in such a manner that the invention is functional, *i.e.*, it can achieve the intended result. *Union Pacific Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690 (Fed.Cir.2001) ("To satisfy section 112 of the 1952 Patent Act, the specification must enable a person of ordinary skill in the art to make and use the invention." (citing 35 U.S.C. § 112, ¶ 1)).

■ Under the doctrine of claim differentiation, "two claims of a patent are presumptively of different scope." *Kraft Foods*, 203 F.3d at 1366–67 (citations omitted). Claim differentiation, however, creates only a "presumption that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'" *Id.* at 1368 (citation omitted).

■ Sometimes a claim is phrased in "means-plus-function" language: the language calls for a structure having the capacity to perform the function recited, *e.g.*, "means for ...." *See* John Gladstone Mills III *et al.*, *Patent Law Basics* § 14:20 (2004). Limitations in the means-plus-function format are governed by § 112, ¶ 6, which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and each claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. A means-plus-function limitation requires a court "first to identify the claimed function and then to determine the structure in the specification that corresponds to that function." *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370 (Fed.Cir.2004); *accord Gemstar–TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1362 (Fed.Cir.2004) ("We consult the claim language to determine the function of the limitation.... We then consult the written description to determine the corresponding structure necessary to accomplish the stated function."). The use of the word "means" creates a presumption that § 112, ¶ 6 applies, while the absence of the word "means" creates a presumption that it does not apply. *Personalized Media Communications, LLC v. ITC*, 161 F.3d 696, 703–04 (Fed.Cir.1998); *accord Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed.Cir.2004). "The use of the term 'means' is 'central to the analysis,' ... and has come to be closely associated with means-plus-function claiming." *Lighting World*, 382 F.3d at 1358 (citations omitted). The presumptions can be overcome "if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant." *Personalized Media*, 161 F.3d at 704.

**b. Infringement**

Once a claim has been construed, the second step of the analysis is to determine whether the accused device infringes the claim, either literally or under the doctrine of equivalents. The question of infringement is a question of fact, both for literal infringement and infringement under the doctrine of equivalents. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir. 1998); *In re Omeprazole*, 222 F.Supp.2d 423, 503 (S.D.N.Y.2002), *aff'd*, 84 Fed. Appx. 76, 2003 WL 22928641 (Fed. Cir. Dec 11, 2003).

■ To prove literal infringement, the patentee must demonstrate that the accused product or method includes each and every element or limitation of the claims in question. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed.Cir. 1995); *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed.Cir. 1995). It is the patentee's burden to show literal infringement by a preponderance of the evidence. *Braun, Inc. v. Dynamics Corp.*, 975 F.2d 815, 819 (Fed.Cir.1992).

■ A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element of the claimed invention, or its "equivalent," is found in the accused product or method. *Eagle Comtronics, Inc. v. Arrow Communication Labs.*, 305 F.3d 1303, 1315 (Fed.Cir.2002); *see Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). "The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 723, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Claimed limitations are considered "equivalent" if there is only an "insubstantial difference" between the claimed element and the corresponding element in the accused device. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed.Cir.1997). To infringe under the doctrine of equivalents, the accused product or method must perform substantially the same function, in substantially the same way, to achieve substantially the same result as the patented product or method. *Eagle Comtronics*, 305 F.3d at 1315 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed.Cir.1994).

### 2. *Application*

I address claim construction first and infringement second.

#### a. *Claim Construction*

##### (i) *Claim 1*

■ Claim 1 describes a "combination" of a cutting head and string rotationally driven by a drive shaft, "said combination comprising" at least one generally straight length of string inserted into an aperture of a cutting head rotated by a drive shaft, and including "at least one *clamping means* for selectively fixing each said string to said head." (PX 3 at col. 6 (emphasis added)).

The parties disagree as to the meaning of the phrase "clamping means." Kwik argues that "clamping means" refers to "a clamping member having a spring or biasing means for urging a clamping member into engagement or in the direction of a wall," but not requiring that the clamping member be "pivotally mounted" and not requiring that the center of gravity of the clamping member be in any particular location. (Pl. PFFCL ¶¶ 19, 21). Defendants make a two-part argument. First, they argue that if the words "clamping means" are given their plain meaning, the words "cover any conceivable clamping mechanism known to mankind." (Def. Trial Mem. at 8; *see* Def. PFFCL at 34). Such a construction would be so broad as to render the claim invalid, defendants argue, and thus, in the second part of their argument, they contend that therefore claim 1 must be narrowly construed by reading into it the structural limitations of the specification. (Def. PFFCL at 34–35). Hence, "clamping means" must be construed, according to defendants, to include a spring element working with a pivotally-mounted clamping member with a strategically placed center of gravity. (*Id.* at 35–36).

The interpretation of "clamping means" turns on the applicability of paragraph 6 of § 112, which, as noted above, would require the claim to be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6; *see Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed.Cir. 1999) ("When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments.").

I conclude that § 112, ¶ 6 applies. First, claim 1 uses the word "means," thereby triggering the presumption that § 112, ¶ 6 applies. Second, Kwik simply has not rebutted the presumption. The claim is written in "means-plus-function" language; indeed, it fits precisely within the terms of § 112, ¶ 6, as it is a claim for a "combination" expressed as a "means" for performing a specified function— "clamping"—without specifically reciting "structure, material, or acts in support thereof." 35 U.S.C. § 112, ¶ 6. Hence, the claim must "be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.*

The specification of the '666 Patent describes a cylindrical body with a disc-shaped plate and surrounding slide wall, with slots. It further states: "A clamping member is *pivotally mounted* adjacent each aperture, opposite the corresponding pressing wall so that its *center of gravity is disposed* between the *pivotal mounting* and the corresponding pressing wall." (PX 3, cols. 2–3 (emphasis added)). The specification further refers to "two degrees of clamping force," one generated by springs that hold the string in place when the cutting head is not in use and the second that is generated when the cutting head rotates and creates a centrifugal

force "that acts on the *centers of gravity* of the clamping members and enhances the gripping force thereof." (*Id.*, col. 3 (emphasis added)). Accordingly, the specification makes clear that "clamping means" in claim 1 must be construed to include a spring element working with a pivotally mounted clamping member with a strategically placed center of gravity.

Kwik makes three arguments in this respect, but none is persuasive. First, it argues that the presumption is rebutted because the term "clamp has a well understood meaning in the art." (Pl. PFFCL at 25–26). That may be true in the broadest sense, but claim 1 does not provide sufficient structure, material, or acts within the claim itself to show how the recited function should be accomplished. Claim 1, by itself, simply does not recite the structure of the clamping means and hence one must resort to § 112, ¶ 6.

Second, Kwik relies on the doctrine of claim differentiation, arguing that the recitation of a "pivotally mounted clamping member" in claim 2 but not in claim 1 shows that claim 1 ought not to be limited to a "pivotally mounted clamping member." (*Id.* at 26–27). The reliance is misplaced. The doctrine of claim differentiation is not a hard-and-fast rule; rather, it is simply a guide to claim construction. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 541 (Fed.Cir.1998). Moreover, "[a] means-plus-function limitation is not made open-ended by the presence of another claim specifically claiming the disclosed structure which underlies the means clause or all equivalents of that structure." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991).

Third, Kwik argues that the prosecution history shows that "clamping means" in claim 1 is intended to be limited to "a cutting head having a spring or biasing means for urging a clamping member into

engagement, or in the direction of a wall," relying on the prosecution history of the parent '424 Patent and a citation to the prior art Foster. The Foster cutting head did not include a spring or biasing means for urging a clamping member into engagement. (Pl. PFFCL at 27). Even assuming, however, that the Foster cutting head did not include a spring or biasing means, the differences between the Foster head and claim 1 of the '666 Patent do not detract from the conclusions that the claim is written in the means-plus function format and that § 112, ¶ 6 applies.

Finally, Kwik's position in this respect is flawed because it is seeking to selectively incorporate the limitation a "spring or biasing means" into claim 1 (even though the words "spring" and "biasing means" do not appear in the claim), but not the element that the clamping member be "pivotally mounted." No basis exists for permitting it to pick and choose what should be imported and what should not be imported.

### (ii) *Claim 2*

Dependent claim 2 adds explicitly the specific structural element of a pivotally mounted clamping member. (PX 3, col. 6).

### (iii) *Claim 15*

█ Independent claim 15 contains the limitations: (1) at least one "clamping member," (2) "pivotally mounted," and (3) urged by a "spring" in a direction towards the opposing wall means and aperture to fixedly support a piece of string. (PX 3, col. 8). The parties appear to disagree as to the interpretation of "spring." Defendants argue that the word "spring" is ambiguous because it is so broad, encompassing any "elastic body or device that recovers its original shape when released after being distorted." (Def. PFFCL at 37 (quoting *Webster's Third New International Dictionary* (1993)). Hence, defendants argue, reference must be made to sources other than the claim itself, includ-

ing the specification, and that the word "spring" in claim 15 refers to an extension or torsion spring, not to *any* kind of spring. (*Id.* at 37–38). In contrast, Kwik argues that the word "spring" is not to be limited by the specification, and contends that " 'spring' certainly calls to mind a reasonably well defined structure, used in common parlance and by persons skilled in the art to designate structure." Hence, Kwik argues, "spring" refers to any spring, functioning in any way. (Pl. Reply to Def. PFFCL at 8–9).

I agree with defendants' proposed construction. The word "spring," by itself, is so broad as to be ambiguous. I do not believe that as used here it calls to mind a "reasonably well defined structure." Rather, many structures could serve as a spring, including structures made not from wire but from plastic. (*See* 10/21/04 Tr. at 81–84). Moreover, I accept defendants' expert's testimony that the rotational movement required of a pivotally mounted clamping member could only be accomplished with certain springs. Hence, I conclude that the reference to "spring" in claim 15 is to an extension or torsion spring.

### b. *Infringement*

### (i) *Literal Infringement*

█ The Allis device does not literally infringe claims 1, 2, or 15 of the '666 Patent because the device does not contain each and every limitation set forth in those claims as construed by the Court. In particular, the Allis device does not use a pivotally mounted clamping member, nor does it rely on a strategically placed center of gravity. Accordingly, Kwik's claim of literal infringement is rejected.

### (ii) *Doctrine of Equivalents*

█ Likewise, I conclude that the Allis device does not infringe claims 1, 2, or 15

under the doctrine of equivalents. Kwik has not demonstrated that every element claimed in the '666 Patent, or its "equivalent," is found in the Allis device. Kwik has not shown that there is only an "insubstantial difference" between the claimed elements and the corresponding elements in the Allis device. To the contrary, I conclude that the Allis device does not perform substantially the same function in substantially the same way to achieve substantially the same result as the patented invention.

The limitations claimed in the '666 Patent differ from the elements of the Allis device in several respects. First, the '666 Patent requires a pivotally-mounted clamping member; the Allis device uses a slidably-mounted clamping member. Second, the '666 Patent requires a rotational movement of the clamping device; the Allis device uses a linear, sliding motion. Third, in the '666 Patent, the location of the center of gravity of the clamping member is significant; in the Allis device the center of gravity does not influence the clamping force. Fourth, in the '666 Patent, two types of springs are described—a torsion spring and an extension spring, but both require that one end of the spring be attached to the cam and the other to a side wall; in the Allis device, the spring biasing is accomplished with a different kind of structure: an unattached compression spring. (See 10/21/04 Tr. at 69, 81).

These differences are not insubstantial. See, e.g., Mas–Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1213 (Fed.Cir.1998) ("the stepper motor translates its power into rotational motion, whereas the claimed [structure] uses linear motion"). They are significant, as demonstrated by the fact, as noted by the Court at trial, that the Allis device is easier to assemble than the Iacona device. (10/13/04 Tr. at 126–27). Hence, Kwik's claim of infringement under

the doctrine of the equivalents is rejected as well.

**B. Defendants' Counterclaim**

**1. Applicable Law: Patent Invalidity**

Patents issued by the Patent Office are presumed valid. 35 U.S.C. § 282. To overcome this presumption of validity, the party challenging the patent bears the burden of proving invalidity by clear and convincing evidence. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir.2003); *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1036 (Fed.Cir.2001); *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1359 (Fed.Cir.1998). Defendants contend that Claims 1–10 and 15–19 of the '666 Patent are invalid based on the doctrines of anticipation and obviousness.

**a. Anticipation**

■ A patent is rendered invalid under the doctrine of anticipation if there exist prior art references that disclose every single element of the claimed invention. *ATD*, 159 F.3d at 545; *see also* 35 U.S.C. § 102. This disclosure does not have to be expressly stated: " 'To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently.' " *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999) (quoting *In re Schreiber*, 128 F.3d 1473, 1477 (Fed.Cir. 1997)). To inherently disclose patent limitations for purposes of anticipation, the prior art reference must operate according to the claim limitations it allegedly anticipates. *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed.Cir. 1999); *Atlas Powder*, 190 F.3d at 1347.

Inherency ... may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient. If, however, the disclo-

sure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.

*MEHL/Biophile,* 192 F.3d at 1365.

 Anticipation of a patent is a question of fact, as is the question of whether a prior art reference inherently discloses a patent claim limitation. *Atlas Powder,* 190 F.3d at 1346; *Hazani v. United States Int'l Trade Comm'n,* 126 F.3d 1473, 1477 (Fed.Cir.1997). In evaluating allegations of anticipation, the relevant question is whether a patent claim "reads on" the prior art. *Atlas Powder,* 190 F.3d at 1346 (citing *Titanium Metals Corp. v. Banner,* 778 F.2d 775, 781 (Fed.Cir.1985)). The question is whether all the claim limitations in the patent at issue were present, expressly or inherently, in a single prior art reference, as understood by a person of ordinary skill in the art, at the time the patent application was filed. *In re Omeprazole Patent Litig.,* 222 F.Supp.2d at 517.

#### b. *Obviousness*

 A patent may be invalid if there are prior art references that motivate a person of ordinary skill in the art to make the claimed invention:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). Unlike anticipation, where every claim limitation in the patent at issue must be present in a single piece of prior art, an obviousness inquiry involves examining the combination of elements in multiple prior art references.

 Obviousness is ultimately a question of law that is based on underlying facts. *Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.,* 264 F.3d 1344, 1354 (Fed. Cir.2001); *ATD,* 159 F.3d at 546. The fact finder must consider: "1) the scope and content of the prior art; 2) the differences between the prior art devices and the claimed invention; 3) the level of ordinary skill in the art; and 4) objective considerations, such as commercial success, long felt need, failure of others, and copying." *Sandt,* 264 F.3d at 1354 (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)); *see also ATD,* 159 F.3d at 546. These factual inquiries must be considered from the perspective of a person with ordinary skill in the relevant art. *Ecolochem, Inc. v. S. Cal. Edison Co.,* 227 F.3d 1361, 1371 (Fed.Cir. 2000); *Al–Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1323 (Fed.Cir.1999); *In re Rouffet,* 149 F.3d 1350, 1357 (Fed.Cir. 1998).

 Additionally, for a patent to be obvious in light of the prior art teachings, the party challenging patent validity must show some motivation or suggestion to combine the various references. *Al–Site,* 174 F.3d at 1323–24. The motivation to combine prior art references need not be explicit but may be inferred from three possible sources: "the nature of the problem to be solved, the teachings of the prior art, and the knowledge of persons of ordinary skill in the art." *In re Rouffet,* 149 F.3d at 1357. In some situations, where the prior art and the invention at issue are relatively straightforward, the motivation to combine may be "apparent without more." *Display Techs., Inc. v. Paul Flum Ideas, Inc.,* 60 Fed.Appx. 787, 794, 2002 WL 32066815, at *6 (Fed.Cir. March 4, 2002).

## 2. *Application*

**▮** I find that defendants have not met their burden of showing, by clear and convincing evidence, that claims 1–10 and 15–19 are invalid for anticipation or obviousness.

First, defendants argue that if the words "clamping means" are given their ordinary meaning, claim 1 is invalid because it would be so broad that the claim would "describe[ ] every fixed line string trimmer head in the market." (10/12/04 Tr. at 73–74). Defendants' expert testified that if claim 1 is construed to include any rotating trimmer head with slots in its side wall through which fixed lengths of trimmer string can be inserted and held in place by some undefined clamping means, the claim does not describe anything that was non-obvious or unique from the perspective of an engineer who has designed and operated vegetation trimmer heads. (10/21/04 Tr. at 77–78). While I do not disagree with that statement, defendants' argument is rejected because, as discussed above, I construed claim 1 more narrowly by applying § 112, ¶ 6.

Second, defendants identified four patents that they claim, individually or in combination, anticipated or rendered obvious the use of a spring-biased, pivotally mounted clamping member to hold a fixed length of string in a vegetation trimmer. (DXs 36–39). The argument is rejected. None of the prior art references discloses, explicitly or inherently, each and every element of the claimed invention. None of the prior art references includes a spring for urging a clamping member in the direction of a pressing wall or a pivotally mounted clamping member urged by a torsion spring and working together with centrifugal force to hold a straight length of string in place.[6]

Okamoto uses a single screw member threaded into an opening to hold all the strings in place. (DX 36 at col. 2). It does not teach a spring biased clamping member or at least one clamping means for fixing each string. Luick involves the insertion of a cutting line into a "passage," and an "abutment" attached to the end of the line prevents the line from going all the way through the passage. (DX 37 at col. 6). The string is removed by pushing it back out in the direction opposite from the way it was inserted; in the claimed invention, the string is removed by pushing it all the way through, in the same direction it was inserted.[7] Petty involved a very different invention, as it uses threaded screws that must be individually tightened to mount, without the use of springs, flexible rods having a bent end. (DX 38 Fig. 3). It does not teach a spring biased clamping member or generally straight lengths of string. Thurber is also a very different device, as it uses spools of line and an automatic feeder. A gripper and spring are used, but as part of the automatic feeding mechanism. (DX 39). Thurber does not use lengths of straight line, and the line is not fixed to the head but is fed from a spool automatically.

Third, with respect to claim 15, defendants identified a number of patents going

---

6. Although I found defendants' expert to be credible in many respects, I reject his testimony on the issue of invalidity, for his descriptions of the prior art references omitted significant matters.

7. With respect to Luick, Gililland acknowledged that the patent does not reference a "spring," but he contended that a spring is "implied in how the function[ ] is described." (10/21/04 Tr. at 82). The difficulty with this argument is that, as defendants argued elsewhere, a "spring" can include a lot of very different structures and mechanisms, and it is not obvious just from the fact that a spring of some kind is implied that the function can be realized in a particular way.

back many years disclosing spring biased clamping means for holding string, line, cord, rope, and wire. I am not persuaded that it would have been obvious to one skilled in the art that one or more of the prior art references could have been modified to use a spring biased, cam shaped, pivotally mounted clamping member to hold a fixed length of string in place in a trimmer head rotating at 10,000 rpm. Indeed, even Allis testified that although he was familiar with the Gripple device from his youth, he was able to come up with his invention only after he disassembled the Iacona device and saw how the patented invention worked. (10/13/04 Tr. at 80–84).

Finally, it is significant that even though some of these prior art references had existed for many years, there still was a long-felt need for a convenient and easy-to-load trimmer head as late as the late 1990s. Both Iacona and Allis felt the need themselves. I am simply not persuaded that a modification of these prior art references as suggested would have been obvious to a person with ordinary skill in the art.

Accordingly, defendants' counterclaim for invalidity is rejected as to all the disputed claims—claims 1–10 and 15–19 of the '666 Patent.

## CONCLUSION

For the reasons set forth above, judgment will be entered in favor of defendants dismissing Kwik's claims of patent infringement and in favor of Kwik dismissing defendants' counterclaim for invalidity. Costs to defendants. No attorneys' fees. Defendants shall submit a proposed judgment on notice within five business days hereof.

SO ORDERED.